## Richmond.

### THE BOARD OF PUBLIC WORKS AND ALS. V. GANNT AND ALS.

#### December 10, 1882.

1. SOVEREIGNTY.—It is an established principle that a sovereign cannot be sued in its own courts, or in any other without its permission. This principle applies to states of the union (except as to controversies between two or more states—U. S. Const. Art. III, §2, clause 1), as well as to the United States governmont. And it may, at any time, revoke such permission even as to antecedent contracts, without impairing the obligation thereof. See 11 Otto, 338. Even when judgment is rendered, she may determine for herself whether she will pay it or not. *Ib.* Though in form the suit be against officers or agents of the State, yet if in effect, it be against the State itself, this principle applies.

2. IDEM—*Case at bar.*—In February, 1881, Board of Public Works of Virginia sold State's interest in Atlantic, Mississippi and Ohio railroad for $500,000. In February, 1882, legislature ratified the sale. By act of March 5, 1882, $100,000 thereof was appropriated to Normal and Collegiate Institute. By act of April 21, 1882, board of public works was directed to pay this $500,000, when received, into the public treasury; $100,000 thereof to the credit of the State board of education for the benefit of said institute, and the remaining $400,000 to the credit of the public school fund, subject to the draft of the State board of education. In June, 1882, G and R filed their bills in the circuit court of R, representing themselves to be creditors of the State, and as such entitled to have the said funds paid into the public treasury to the credit of the sinking fund, in conformity with the act of March 30, 1871, known as "The funding bill." They claimed that the acts of 1882, appropriating said funds to educational purposes, are unconstitutional and void, as being in violation of the contract made with the public creditors by said funding bill; and prayed that the board of education be restrained from taking possession of said funds; and that the commissioners of the sinking fund be decreed to take charge thereof, and to purchase therewith bonds issued under said funding bill. The persons composing the board of education, the board of public works, the board of commissioners of the sinking fund and the board of visitors of Virginia Normal Institute, as such and

individually, and others, were made defendants, but no relief was asked against them individually, and they had no personal interest in the ques tion.    The two cases being heard together—

HELD :

1. Whatever the form of these suits, they were, in effect, suits against the State of Virginia, and not having been permitted by her, are not maintainable.

2. They were for the specific execution of an executory contract, and the recovery of money as clearly belonging to the State, notwithstanding the act of March 30, 1871, as the interest in the railroad whereof it is the proceeds, and the bills are precisely as they would have been had the proceeding been in form against the State.

3. This court is unable and unwilling to declare that the legislature transcended its power in passing the several acts appropriating the said funds to educational purposes in the State.

4. As respects *all* the subjects mentioned in §5 of the act of March 30, 1871, the provisions of that section are merely executory, and cannot be carried into effect without further legislation.

5. It is not true that as soon as the fund was realized, a trust attached to it in favor of the creditors, which might be enforced at their suit against the State.

6. Nor did the appropriation of the fund to the Normal Institute, and to the free school fund, divest the State of the ownership or possession thereof; it being none the less her property and in her possession, because placed under the control of her agency, the State board of education.

3. JURISDICTION—*Suits against agents and officers* of a government in possession of specific property under a void title, may be maintained by the true owner, and it is no answer for them to say that the State has an interest in or claim to the property, but no decision has gone to the extent of affirming that such suit can be maintained for the recovery of money or property belonging to the State, because it happens to be found in the possession of its ministerial officers or agents.

4. IDEM—*Antoni* v. *Wright*, 22 Gratt. 833, and *Clark* v. *Tyler*, 30 Gratt. 134, distinguished from case at bar.    *There* the contract was executed, and no further legislation needed to give it effect.    By equitable set-off the coupons extinguished the taxes without the coupons going into the public treasury.    Not so here.

Appeal from decree of circuit court of Richmond city, rendered 8th July, 1882, in the two consolidated causes of Henry B. Gannt and William L. Royall, plaintiffs, *v.* Wil-

liam E. Cameron, S. Brown Allen, D. R. Reveley, individu-
ally and as members of the board of public works of
Virginia; said Cameron, F. S. Blair, attorney-general, and
R. R. Farr, as members of the board of education; said
Allen, and Reveley, and H. H. Dyson, as commissioners of
the sinking fund; said Allen, as auditor of public ac-
counts; said Reveley, as treasurer of the State; said Dyson,
as second auditor; said Farr, as superintendent of public
instruction; Planters National Bank of Richmond; The
Richmond Banking and Insurance Company; John B. Davis,
president of each; and the board of visitors of the Vir-
ginia Normal Institute, composed of F. E. Buford, Peter J.
Carter, D. M. Norton, William Troy, A. W. Harris, W. H.
Pleasants and R. L. Mitchell, and each of the said persons
and corporations, defendants.

The object of the suits was to enjoin the board of edu-
cation from receiving the sum of $500,000, realized from
the sale of the State's interest in the Atlantic, Mississippi
and Ohio railroad, and to require the commissioners of the
sinking fund to take charge thereof, and to purchase
therewith bonds of the State of Virginia issued under the
act of March 30th, 1871, for cancellation and redemption.
The circuit court awarded the injunction and decreed as
prayed.

For the understanding of the case the remaining facts
are sufficiently indicated in the *syllabus* and stated in the
opinion of the court. From the decree, the four boards
and others appealed.

*F. S. Blair*, attorney-general, and *John S. Wise*, for the ap-
pellants.

1. The board of education, public works, &c., are cor-
porations, and should have been sued by their corporate
names.   Code 1873, ch. 66, § 2.

2. Act of 14th January, 1882, forbid coupons to be received for taxes, &c., until ascertained by a jury to be genuine. Both bills are founded on coupons issued under act of March 30, 1871, and yet they do not aver that those coupons have been verified as prescribed by law.

3. The sinking fund was no part of the State's contract with her creditors, but a device for her own convenience, and upon it, her creditors have no lien, legal or equitable.

4. The sinking fund created by § 5 of act of March 30, 1871, was repealed by the McCulloch bill of 1879, so as to modify, and even to repeal, the funding act of 1871 in some particulars. *Vide Wise Bros.* v. *Rogers, 2d Auditor,* 24 Gratt. 169; *Maury & Co.* v. *Same,* Ib. p. 171; also *Paulsen* v. *Rogers,* 32 Gratt. p. 654.

5. Court below confounded the revenues of the State with those of a private individual, while in fact the former must, *ex necessitate rei,* be under the control of the legislature.

6. Complainants must set out and contract consistent with the sovereign powers and duties of the State. This they failed to do.

7. They must then show that the acts alleged to be unconstitutional, impaired the obligation of that contract. This they also failed to do.

8. The receivability of coupons for taxes, &c., was the consideration offered for the surrender of the old and the acceptance of the new bonds. *Vide Hartman* v. *Greenhow,* 102 U. S. R. p. 679; *Woodruff* v. *Trapnall,* 10 Howard, 190; *Furman* v. *Nichol,* 8 Wallace, 44.

9. The creditors had the entire revenues of the State as their security, and were not endangered by the withdrawal of $500,000. *Vide City of Richmond* v. *R. & D. R. R.,* 21 Gratt. 611.

10. The sinking fund was never appropriated to the creditors, only set apart for them, as were fines, &c., and the State remains the owner of the same. Such was the ruling in *Clark* v. *Tyler,* 30 Gratt. 134, and is applicable here.

11. The acts complained of sought to restore to the schools the $1,500,000 of school money wrongfully diverted from them, and applied to interest on the bonds. The restoration was matter of plain justice.

12. By act March 30, 1871, commissioners of the sinking fund had a discretion as to paying out funds in their hands. Where *a discretion exists* in a public officer, no compulsory process by *mandamus,* injunction or otherwise, will lie.

*William L. Royall,* for the appellees.

The funding act of 1871 held out an offer to the creditors of the State that if they would surrender their old bonds and release the State from one-third of her debt, she would make their interest on the remaining two-thirds secure by tax-paying coupons, and she would pay the principal through a sinking fund to be composed in part of her interests in the various railroads, &c. When the creditors accepted this offer, a contract was raised between themselves and the State, the obligation of which she could not afterward impair. *The State of Louisiana* v. *Pilsbury,* reported in The Reporter, vol. 13, p. 609, January to June, 1882; *Graham* v. *Horton,* 6 Kansas, 343.

There can be but one possible question in the case. Can the court lay its hand upon this fund? This question, too, is closed by the decisions of the supreme court of the United States. *Osborn* v. *The Bank,* 9 Wheaton, 738; *Davis* v. *Gray,* 16 Wallace; 203.

STAPLES, J., delivered the opinion of the court.

The subject of controversy in this case is the sum of $500,000, proceeds of the sale of the State's interest in the Atlantic, Mississippi and Ohio railroad.

The sale was made by the board of public works, on the

10th day of February, 1881, subject to the ratification of the legislature, which was obtained the 9th of February, 1882. By an act passed March 5, 1882, the sum of $100,000, part of the $500,000, was appropriated to the "Normal and Collegiate Institute," a State institution, incorporated by the legislature. The amount thus appropriated was directed to be retained by the public treasurer to the credit of the State board of education. By another act, passed 21st of April, 1882, it was made the duty of board of public works, whenever it should receive the $500,000 from the purchasers, to pay the sum of $400,000, part thereof, into the public treasury, to the credit of the public free school fund, subject to the draft of the state board of education. Acts of 1881–2, pp. 283–473.

In June, 1882, the appellees filed their bills in the circuit court for the city of Richmond, in which they represented themselves to be creditors of the State of Virginia, and as such, having the right to demand that the fund, realized from the sale of State's interest in the Atlantic, Mississippi and Ohio Railroad Company, shall be paid into the public treasury to the credit of the sinking fund, in conformity to the provisions of the act of March 31, 1871, known as the funding bill.

They claim that the acts of the legislature, appropriating this fund to educational purposes, is in violation of the contract made with the public creditors and are therefore unconstitutional and void. And they ask that the board of education be restrained from taking possession of the fund, and that the commissioners of the sinking fund may be decreed to take charge of it, and to purchase with the same bonds of the State of Virginia issued under the act of March 30, 1871. In the view I take of this case, it is unnecessary at present to refer further to the pleadings or to the facts appearing on the record.

It may be conceded, for all the purposes of the argument,

that the fifth section of the act of March 30, 1871, establishes a contract on the part of the State with the public creditor which ought in good faith to be performed. The question arises whether the contract is of such a nature that the court can take cognizance of it and compel its execution. Before considering that question, it will be advisable to ascertain, if possible, to what extent a State may be arraigned at the suit of a citizen before her own tribunals.

It is an established principle of sovereignty, in all civilized nations, that a sovereign State cannot be sued in its own courts, or in any other, without its consent and permission. And this principle, except so far as it is modified by a single provision in the constitution of the United States, applies as well to the States of the union as to the government of the United States. In *Bank of Washington* v. *State of Arkansas*, 20th Howard, 530, 532, Chief-Justice Taney said: "Those who deal in the bonds and obligations of a sovereign State are aware that they must rely altogether on the sense of justice and good faith of the State; and that the judiciary of the State cannot interfere to enforce these contracts without the consent of the State, and the courts of the United States are expressly prohibited from exercising such a jurisdiction."

In the more recent case of the *Memphis and Galveston Railroad Company* v. *Tennessee*, 11 Otto, 338, the supreme court of the United States said:

"The principle is elementary that a State cannot be sued in its own courts without its consent. This is a privilege of sovereignty, and it may repeal at any time its laws giving such consent, even as to antecedent contracts, without at all infringing the constitutional provision which prohibits a State from passing any law impairing the obligation of the contract.

" When a judgment has been rendered against the State,

its liability has been judicially ascertained, but there the power of the court ends. The State is at liberty to determine for itself whether it will pay the judgment or not. The obligations of the contract have been finally determined, but the claimant still has only the faith and credit of the State to rely on for their fulfillment. The courts are powerless. Everything after the judgment depend on the will of the State."

The same doctrine was proclaimed by this court in *Higginbotham's Executor* v. *The Commonwealth*, 25 Gratt. 641. Judge Bouldin, in delivering the unanimous opinion of the court, said:

"All the court could do would be to ascertain and render judgment for the debt. Whether it shall be paid or not rested with the legislative department."

As was said by the supreme court of the United States in "The Siren," 7 Wallace, 152, "The doctrine rests upon reasons of public policy; the inconvenience and danger which would follow from any different rule. It is obvious that the public service would be hindered, and the public safety endangered, if the supreme authority could be subjected to suit at the instance of every citizen, and consequently controlled in the use and disposition of the means required for the proper administration of the government. The exemption from direct suit is, therefore, without exception."

There are a number of cases which hold that the true owner of property found in the possession of agents or officers of a government under a void title may bring an action against such officers or agents for its recovery; and it is no answer to say that the State has an interest in or claim to the property. In such cases jurisdiction is neither given nor ousted by the relative situation of the parties concerned in interest, but by the relative situation of the parties named on the record. The whole question is fully dis-

cussed by Chief-Justice Marshall in *Osborne* v. *United States Bank,* 9 Wheat, 738, 856.

In that case he said, that an action of detinue might have been maintained for the specific article taken, if the bank had possessed the means of describing it, and the interest of the State would not have been an obstacle to the suit of the bank for enforcing its demand. And so, in a like case, a court of equity may interfere by injunction to prevent the transfer of the specific article which, if transferred, would be irretrievably lost to the owner—such, for example, as negotiable securities and stocks, with respect to which the remedy by action at law is inadequate. In this class of cases it is not necessary to make the State a party on the record, for the true owner may recover his property against any one in the unlawful possession of it.

This doctrine is reaffirmed in *Davis* v. *Gray,* 16 Wallace, 203. It is worthy of observation that, in this latter case, Mr. Justice Davis (with whom Chief-Justice Chase concurred) dissented from the majority of the court. He said that the suit, though in form otherwise, was in effect a suit against the State of Texas. Its object was to deprive the State of the power to dispose in its own way of its public lands. In his opinion the bill ought to have been dismissed, because the State is exempt from suit at the instance of private persons, and on the face of the bill it was apparent that the State was arraigned as a party.

In *United States* v. *Peters,* 5 Cranch, 115, the judgment of the supreme court was based upon the ground that Rittenhouse held the money in his own right. Chief-Justice Marshall said: "The suit was not against the State of Pennsylvania or its treasurer, but against the executrices of David Rittenhouse. If these proceeds had been the actual property of Pennsylvania, however wrongfully acquired, the disclosure of that fact would have presented a case on which it is unnecessary to give an opinion." * * *

" Since, then, the State of Pennsylvania had neither possession of, nor right to, the property on which the sentence of the district court was pronounced, and since the suit was neither commenced nor prosecuted against that State, there remains no pretext for the allegation that the case is within that amendment of the constitution which has been cited; and, consequently, the State of Pennsylvania can possess no constitutional right to resist the legal process which may be directed in this cause."

In the very recent case of *United States* v. *Custis Lee,* involving the titled to the Arlington estate, this whole subject was most exhaustively and ably discussed by Mr. Justice Miller, representing the majority, and by Mr. Justice Gray, representing the minority of the court. It is a discussion worthy of that high tribunal in its palmiest days. The opinion of Mr. Justice Miller proceeds upon the concession that the title of General Lee is clear and indisputable and that of the government a nullity. He declares that the principle which exempts a government from process at the suit of a citizen is as applicable to each of the States as it is to the United States, except in those cases where, by the constitution, a State may be sued in the Federal courts. He insisted, however, that the principle did not extend to those cases where neither the United States nor the State is a necessary party to the record, and that the mere suggestion of title in a State to property in possession of an individual cannot arrest the proceedings of the court in an action by the real owner. It cannot be (he declared) that, when in a suit between two citizens for the ownership of real estate one of them has established his right to the possession of the property according to all the forms of judicial proceedure, and by the verdict of a jury, and the judgment of the court, the wrongful possessor can say successfully to the court, Stop here; I hold by order of the President, and the progress of justice must be stayed.

No one in this country will, I imagine, express a word of dissent from these truthful and noble utterances. It is worthy of observation, however, that four of the judges, among whom was Chief-Justice Waite, did not agree with Mr. Justice Miller, and that the prevailing opinion was carried by a majority of one vote.

It will thus be perceived that the cases which hold that a suit may be maintained at the instance of an individual against an officer or agent of a State, stand upon peculiar grounds, and that no decision goes to the extent of affirming that such a suit may be maintained for the recovery of money or property belonging to the State, because it happens to be found in the possession of her ministerial officers or agents.

In the case of *Antoni* v. *Wright*, 22 Gratt. 833, and *Clarke* v. *Tyler, Sergeant,* 30 Gratt. 134, the State was not only not a party to the record, but there was no process by which she could properly have been made a party. · The contract on her part to receive coupons in payment of taxes was an executed one, requiring no further legislation to give it effect. Judge Bouldin, in the course of his opinion in the first-named case, said: "By the equitable principle of *setoff* allowed by the funding act, the taxes are paid or extinguished by the *coupons* without ever going into the State treasury." According to his view, the court, by the form of the contract, was enabled to give effect to this equitable principle of *setoff*, not by a suit against the State, but by compulsory process against her officers charged with the specific duty of receiving coupons in payment of taxes.

Now, what are the cases before us? Whatever they may be in form, they are in effect suits against the State for the specific execution of an executory contract—suits for the recovery of money belonging to the State as clearly as the interest in the railroad of which it is the product. The bills are against the board of public works and the board

of education. Although the persons composing those boards
are made parties, in their individual character, no relief is
asked against them as such, and it is obvious that as indi-
viduals they have no sort of concern or interest in the
question. The acts complained of are acts of the legisla-
ture, and the relief sought is against corporations composed
exclusively of officers of the State. The bill is precisely
such as it would have been if the appellees were proceed-
ing against the State.

Conceding that the fund in controversy is subject to a
pledge on behalf of the public creditors, it is still the pro-
perty of the State as absolutely as any of the money in her
treasury, or the capitol square and public buildings.

It is none the less in her possession because it is under
the control of the board of education, for that board is a
mere agency of the State, having no existence or power
independently of the State. As was said by Judge Ander-
son in *Clarke* v. *Tyler*, 30 Gratt. 159: "After money is set
apart as a literary fund, the Commonwealth is still the sole
owner of it, as she is of all the funds and property of the
board of education and the other corporations which are
composed of officers of the government, the funds and
property of which are the sole property of the Common-
wealth."

The decree of the circuit court enjoins the board of edu-
cation, the Normal and Collegiate Institute, and its board
of visitors, from any interference with the fund which is
the subject of this controversy.

It further directs the treasurer of the State to take pos-
session of the money and to pay over the same to the credit
of the sinking fund, to be applied by said commissioner as
directed by the act of 1871.

I repeat, this is in effect a decree against the State of
Virginia for money appropriated by the legislature to a
specific purpose, and the board of education is required to

disregard the law under which alone it has the custody of the fund.

. The State is arraigned at the suit of individuals, before her own tribunals, not to deliver up specific property to the true owner, held in violation of law, but to surrender her own property, in conformity with an alleged lien or pledge asserted by her creditors. The authority for this extraordinary proceeding is supposed to be found in the fifth section of the act of March 30, 1871, known as the 16th section of chapter 42, Code 1873, page 405. I will give it in full: "Whatever sum may be realized from the claims of this State against Seldon, Withers & Co. and the Chesapeake and Ohio Canal Company, and from the sale and disposition of the stocks and bonds, and debts, owned by the State, in and against any and all railway and other improvement companies, and all sums which may be realized from the claims of this State against the United States, and from any sales of real estate now belonging to the Commonwealth, shall be paid into the treasury of the State, to the credit of the sinking fund, hereby authorized and created."

"In the year 1880, and annually thereafter, till all the bonds issued under and by authority of this act, shall have been paid, there shall be levied and collected the same as other taxes a tax of two cents on the one hundred dollars of the assessed valuation of all the property—personal, real, and mixed—in the State, which shall be paid into the treasury of the State to the credit of the sinking fund."

By another section the treasurer, and the first and second auditors are appointed commissioners of the sinking fund, and have the management and control thereof, and shall annually, or oftener, apply whatever sum or sums may be to the credit of the sinking fund to the purchase and redemption of bonds issued in conformity with this chapter.

The learned judge of the circuit court admits that, so far as the appropriation of the proceeds of the taxes men-

tioned in the fifth section is concerned, the provision is merely executory, and cannot be carried into effect without further legislation. But he holds to the idea that to the extent of the then property or interest of the State, the appropriation was consummated by the act of the then supreme authority of the State. I concur with the learned judge fully that the provision relating to the assessment and collection of taxes for the benefit of the sinking fund cannot be made effectual without further legislative enactment. And yet the language of that provision is quite as explicit and direct as that relating to the disposition of the fund in controversy. I think in both cases, indeed, with respect to all the subjects mentioned in the fifth section, the enactment is a mere pledge on the part of the State, requiring for its execution legislative enactment. It can only be regarded as a promise on the part of the legislature that it would, as the occasion required, adopt such legislation as would secure the payment of the funds derived from the sources mentioned into the treasury to the credit of the sinking fund.

Take, for example, the claims against the government of the United States for advances made and sums loaned to the United States during the war of 1812. If this claim is finally allowed by the congress of the United States, I take it that no agent or officer of the State would be authorized to receive the money and pay it into the treasury to the credit of the sinking fund until the legislature passes an act conferring such authority.

The claims included in the fifth section embrace interests which, in 1871, were considered very valuable. Some of them were involved in tedious and expensive litigation; others, it was well understood, could only be settled upon some basis of adjustment and compromise. The claim against the Chesapeake and Ohio Canal Company was of the former character, and was settled, after protracted con-

troversy, under authority of a special act of the legislature.

The State's interest in the various internal improvement companies could never have been disposed of without some legislative enactment framed with reference to that special object, nor could the proceeds of sale have been legally paid into the treasury except under the like sanction and authority. It is clear, therefore, that the act of 1871, so far, at least, as it related to the State's interest in the internal improvement companies, is a mere executory contract, requiring further legislation to give it effect. Under the act of February 9, 1882, ratifying the sale of the State's interest in the Atlantic, Mississippi and Ohio railroad, the money was directed to be paid to the board of public works. It will scarcely be maintained that the board of public works was authorized to make any disposition of the sum received under the act of 1871. By the acts of March 6th and April 27, 1882, the money was directed to be paid into the treasury, to the credit of the State board of education. Neither the treasurer nor the board of education could hold the money for any purpose or give it any direction, other than those pointed out by the laws under which they acquired the possession. It was still the property of State and in the custody and control of the State.

These difficulties are sought to be avoided upon the suggestion that so soon as the fund was realized, a trust attached to it in favor of the creditors. This is a novel idea, certainly, of attaching a trust to a sum of money belonging to the State, to be enforced by the court at the suit of a citizen. When the legislature in the year 1853 appropriated annually from the public treasury the sum of $838,009 out of the accruing revenues, to be set apart as a sinking fund for the liquidation of the interest upon the public debt, no one, I imagine, conceived the idea of the creation of a trust to be enforced against the State. In

*Curran* v. *The State of Arkansas*, 15 Howard, 304, the supreme court of the United States declared that the property of the bank, so far as it became vested in the State, was charged with a trust in favor of the public creditors; but the court did not, upon that ground, place their decision that the State might be held amenable to process, and the property held declared liable to the claim of creditors. The court said that under the statutes of the constitution of Arkansas, as construed by her highest courts, the State might be sued, in such a case, in her own courts, and that the supreme court of the United States would follow that decision, and, in conformity with it, hold that, by its own consent, the State had become liable to a decree in favor of the plaintiff, if he was entitled to it on the merits.

Although this State has given its consent to be sued in certain cases, it has carefully provided that no money shall be drawn from its treasury except in pursuance of an express specific appropriation by law. The effort in this case is, upon the suggestion of a trust or *quasi* lien, to arraign the State as a suitor, in her own courts, and to divest her of her revenues by mandates and restraining orders upon her ministerial officers and agents. No necessity can warrant a judicial tribunal in disregarding the maxim that "that which cannot legally be directly done cannot rightfully be effected by indirection." Sitting here as a judge, it does not concern me to inquire into the moral obligation of the State to make good her engagements. In this case, no injustice is done the bondholders if it be true, as stated in the preamble to the act of April 21, 1882, that between the year 1870 and 1879 more than $1,500,000 of the public revenues dedicated by the constitution to the public free schools have been appropriated to the payment of interest upon the public debt. However that may be, the conviction of the unconstitutionality of a law ought to be very clear and strong, before the courts undertake to pronounce it null and void.

For the reasons already stated, I am unable and unwilling to declare here that the legislature transcended its power in passing the several acts appropriating the fund in controversy to educational purposes in the State. If our decision is against the State, she is utterly without remedy in a matter involving great public interests. If we decide in her favor and commit an error in so doing, the appellees have their redress in an appeal to the supreme court of the United States, whose judgment will finally settle the question and place it beyond the pale of future agitation and controversy. My opinion, therefore, is to reverse the decree of the circuit court and to dismiss the bills filed by the appellees.

BURKS and LEWIS, J's, concurred in the opinion of *Staples*, J.

NOTE BY JUDGE STAPLES.—" Since the foregoing opinion was delivered, the decision of the supreme court of the United States in the case of *John Elliott and als* v. *The Governor, Lieutenant-Governor, Auditor, and other State officers of Louisiana*, has been rendered. The reasoning in that case sustains fully the views presented in my opinion."

ANDERSON, J.   Assuming that the State of Virginia is bound by contract, and that her good faith is pledged to deposit the fund in question in the treasury to the credit of the sinking fund, to be applied by the commissioners thereof to the purchase or redemption of bonds of the State issued under the act of March 30th, 1871—an assumption which needs no argument to maintain—then any act subsequently passed by the legislature to divert said fund from the object to which it has been so dedicated is a violation of the said contract, and unconstitutional and void.

The question as to the right of a State to exemption from suit without her consent—a well-established doctrine which no one would think of controverting-is not involved in these causes. In the case of the United States against Lee, recently decided by the supreme court of the United States, Mr. Justice Miller maintained in his able opinion, and it was so held by a majority of the court, that such exemption is limited to suits against the United States directly and by name, and cannot be successfully pleaded in favor of officers and agents of the United States when sued by private persons for property in their possession as such officers and agents. But in this case the State is not only not sued directly and by name, but it is not a party in interest. She has parted with her interest in the money by a legislative act of appropriation twice—first for the benefit of her creditors, and secondly for the benefit of the Virginia Normal and Collegiate Institute, a corporate body, and the public schools—the former claiming $100,000 of it, and the latter the residue, $400,000, through the board of education. It is substantially a contest between them and creditors of the State under the act of 30th of March, 1871. They are the parties beneficially interested in the subject of the suit, and are parties on the face of the record, through the trustees who represent the Normal and Collegiate Institute and the board of education—a corporation, likewise—which represents the public schools. The latter parties claim title to the fund under the acts of 1882, which appropriate it to them; and the former, the creditors, claim title to it under the act of 1871 aforesaid. It is a contest between these parties, in which the State is not a party, as to which are entitled to it. The creditors claim it under contract with the State, and by an act of appropriation by the legislature of the State in March, 1871.

The adverse parties claim it by acts of appropriation by the legislature in 1882. But if the State was bound by

previous contract, as we have assumed, to appropriate this
fund to the purchase or redemption of bonds which were
issued under the act of 1871, the acts of 1882 appro-
priating it to the adverse parties, impair the obligation of
contract, and are unconstitutional and void. And an act
which is unconstitutional and void can give no title. And
the claim of title to the fund by the Normal and Colle-
giate Institute and the board of education, for and on
behalf of the public schools, being under an unconstitu-
tional and void act, has no support. It is a contract, as we
have said, between these parties and the public creditors
of the State, who hold bonds of the State issued under the
act of March 30, 1871, in which the former show no title;
the acts of assembly under which they claim being uncon-
stitutional and void. What is the foundation of the claim
set up by the latter?

The State is not only bound by contract with her credi-
tors, under the act of March 30, 1871, to apply it to the
purchase and redemption of her bonds, which were issued
under that act, but by the terms of said act it was actually
appropriated to that purpose. Chap. 42, § 16 of the Code
of 1873, provides that "Whatever sum may be realized
from the claims of this State against Selden, Withers &
Company, and the Chesapeake and Ohio Canal Company,
and from the sale or disposition of the stocks and bonds
and debts owned by the State in and against any and all
railway and other improvement companies," &c., &c., "shall
be paid into the treasury of the State to the credit of the
sinking fund, hereby authorized and created." By that
language the legislature not only assumed an obligation to
the creditors on behalf of the State, that the fund in ques-
tion, which the State has since received on account of debts
which were *then* due and owing to her by the Norfolk and
Petersburg, Southside, and Virginia and Tennessee Rail-
way Companies, afterwards consolidated into the Atlantic,

Ohio and Mississippi Railroad Company, should be paid into the State treasury to the credit of the sinking fund authorized and created by that act, but it was an authoritive legislative act that it should be done.

The next section constitutes the treasurer, the auditor of public accounts, and second auditor, commissioners of the sinking fund, and invests them (a majority acting) with the control and management thereof; and then authoritatively directs the disposition which the commissioners shall make of the funds paid into the treasury to the credit of the sinking fund—that is, that they "shall annually, or oftener, apply whatever sum or sums may be to the credit of the sinking fund to the purchase and redemption of bonds issued by authority of this chapter. " The previous section imperatively requires that the stocks, bonds, and debts belonging to the State in or against any or all of the railway companies, when collected, shall be paid into the treasury to the credit of the sinking fund. The amount in question is of that description. And this section commands the commissioners of the sinking fund therein named, annually or oftener, to apply whatever sum or sums may be to the credit of the sinking fund to the purchase or redemption of bonds issued under this act. The money thus received by the State from any of the railway companies, by the authority of this legislative act, must be paid into the treasury to the credit of the sinking fund, and must be applied by the commissioners of that fund to the purchase and redemption of bonds of the State which are issued under that act. The duty is imperative, and no further act of the legislature is necessary to enforce it.

And in addition to the force of law commanding it to be done, the good faith of the Commonwealth is solemnly pledged for its performance. Can it be doubted that it was the duty of the board of public works, under the act aforesaid, to have paid this fund into the treasury to the credit

of the sinking fund? and that any law which diverted it from that purpose, and directed a different disposition of it, impairs the obligation of contract, and has no validity to bind, or to authorize the board of public works to violate their duty under the act of March 30, 1871, and must be disregarded by the courts as unconstitutional and void? I think not. And if the board of public works, ministerial officers of the Commonwealth, fail or refuse to do their duty, the courts may require them to do it, any act of the legislature to the contrary notwithstanding, if the same, in the opinion of the court, is unconstitutional and void. And the money being paid into the treasury as required by the act of 1871, can it be doubted that it is the duty of the commissioners of that fund to apply it to the purchase and redemption of bonds issued under said act; and that, if they neglect or refuse to perform their duty, the courts may compel its performance? I think there can be but one answer to this interrogatory.

What further power or authority can be required by these ministerial officers and agents of the State to execute the law as enacted on the 30th of March, 1871? and which as to the subject matter in controversy, is still in force. And which in fact could not be repealed, except with the consent of the creditors interested, as such repeal would involve the impairment of the obligation of contract. I can conceive of none. No further legislation is necessary to give it effect. The act in itself is full and complete, so far as is necessary to secure the rights of the creditors and to enforce the obligations of the officers and agents of the State affecting the creditors. And all the machinery is provided by law, as will be seen by reference to the subsequent sections of this 42d chapter of the Code, cited *supra,* for the direction of the commissioners in all the details of their duty.

There is no proof of the allegation that $1,504,245.77,

dedicated by sections 7 and 8 of article 8 of the constitution of Virginia to the public free schools, was diverted to the payment of the public debt prior to the year 1880, and that only $225,000 has been restored. If it was diverted at all from objects to which it was dedicated by the constitution, it does not appear that it was applied to the public debt, rather than to objects of general administration. One thing is clear, that the creditors have not received more than they were entitled to, or than the State was bound to provide for them. Indeed, it is certain that they have not received all that they were entitled to, and some of them have received little or nothing. And it would be unjust, and a wrong, to take what belonged to them to reimburse the public schools.

But if the allegations were true, the public creditors were entitled to all they have received. The obligation of the State to them was antecedent to the constitution itself. And it was not competent for the State to provide, by its organic law or otherwise, for the withholding its revenues from their liability to discharge its antecedent obligations of debt, and leave them unsatisfied, and apply its revenues to the building up of schools and colleges, or any other object however meritorious, short of the actual necessities for carrying on the government. I concur in the opinion of the circuit court on this, and other points which I have deemed it unnecessary to elaborate, and, indeed, in the whole opinion, which is clear and able, and must dissent from the decision of this court reversing the decree of said circuit court.

CHRISTIAN, J., concurred with *Anderson*, J.

DECREE REVERSED.