STATE OF NEBRASKA, EX REL. GEORGE W. LEIDIGH, WARDEN OF THE STATE PENITENTIARY, V. SILAS A. HOLCOMB, GOVERNOR, ET AL.

FILED JANUARY 9, 1896. No. 8057.

1. **Constitutional Law**: STATUTES: MANAGEMENT OF PENI-
TENTIARY. The provision of section 32, act of March 4, 1870 (Session Laws, 1870, p. 31), that all transactions and dealings of the state penitentiary shall be conducted in the name of the warden thereof, " who shall be capable in law of suing and being sued in all courts and places, in all matters concerning the said prison, by his name of office," conflicts with section 19, article 5, of the constitution of 1875 creating the board of public lands and buildings, and defining their duties, as well as the act of February 13, 1877 (Session Laws, 1877, p. 188), and was thereby repealed.

2. **Warden of Penitentiary**: BOARD OF PURCHASE AND SUP-
PLIES: MANDAMUS.   Independent of statute, an action may
be maintained on the relation of the warden of the penitentiary
against the board of purchase and supplies to require them to
provide the necessaries for the support of the penitentiary, in
accordance with the provisions of the act of February 15, 1877,
entitled "An act to regulate the purchase of supplies for the
public institutions, and the executive departments of the state"
(Session Laws, 1877, p. 199), since the object of such a proceed-
ing is not the vindication of a mere private right of the relator,
but the enforcement of a public duty which the respondents
owe to the state.

3. ———: POWERS AND DUTIES.   The powers and duties of the
warden of the penitentiary are defined by the act of 1870 (Gen-
eral Statutes, 1873, p. 1031, ch. 76), and he continues to be, as
originally designed, merely the keeper of the prison, subject to
the management and control of the board of public lands and
buildings, as the successor of the board of inspectors created by
said act.

4. **Board of Public Lands and Buildings**: CONVICT LABOR:
LEASE.   The power conferred upon the board of public lands
and buildings by section 17 of the act of February 13, 1877
(Session Laws, 1877, p. 194), to lease the convict labor of the
state for a period not exceeding ten years, is not a continuing
power, but was on the contrary exhausted by a single user.

5. **Statutes**: TITLE OF ACT: CONSTITUTIONAL LAW: CONVICT
LABOR.   Section 5 of the act of 1895, providing for the leasing
of the convict labor until the last day of the next session of the
legislature, is not within the title of said act, to-wit, "An act to
annul a contract between the state of Nebraska and W. H.
Dorgan, alleged assignee of C. W. Mosher, for leasing the peni-
tentiary, penitentiary grounds, and convict labor of the state of
Nebraska,  *  *  *  and to repeal all acts and parts of acts in
conflict with the provisions of this act" (Session Laws, 1895,
p. 237, ch. 66), and is therefore in conflict with the provision of
section 11, article 3, of the constitution requiring the subjects
of acts to be clearly expressed in their titles.

6. ———: ———: ———: ———.   It is apparent from the whole of
said act, including the title and preamble, that the words "for
leasing the penitentiary, penitentiary grounds, and convict la-
bor," as employed in the title thereof, are descriptive merely of
the contract referred to, and not embracing a separate and dis-
tinct subject of legislation.

7. **Duties of Board of Public Lands and Buildings: Con-
VICT LABOR: LEASE.** The board of public lands and buildings
is by section 19, article 5, of the constitution and the act of
February 13, 1877 (Session Laws 1877, p. 188), invested with
the general management and control of all of the public insti-
tutions of the state, except those for educational purposes, and
may, in its discretion, lease the convict labor, penitentiary
grounds, shops, and machinery therein, together with any prop-
erty connected with or incident thereto.

8. ————: ————: ————. It is within the power of the board of
public lands and buildings to provide by contract for the feed-
ing and clothing of the convicts in the penitentiary as one of
the considerations for the leasing of their labor; and such an
agreement with a responsible lessee, who is ready and willing
to perform the conditions of his obligation, would be a sufficient
justification in a proceeding of this character.

9. ————: ————: ————. The contractor or lessee cannot, even
with the assent of the board of public lands and buildings,
usurp any of the functions of the warden as the keeper of
the prison, although he may, and doubtless should, be ac-
corded such privileges, consistent with the rules prescribed for
the government of the prison and the health and safe-keeping
of the convicts, as are necessary to carry into execution his
agreement with the state.

10. ————: **AGENTS.** It being impossible for the board of public
lands and buildings to personally direct the management in de-
tail of the numerous public institutions of the state, they must,
from the necessities of the case, transact much of the business
pertaining to such institutions through agents of their own
creation.

11. ————: ————: **CONVICT LABOR.** In the absence of statutory
restriction, express or implied, it is within the power of said
board to appoint an agent on behalf of the state to lease or
manage the convict labor as well as the shops and machinery
within the penitentiary.

12. ————: ————: ————. Except when furnished by the contractor
pursuant to an agreement with the state, the method prescribed
by statute (Session Laws, 1877, p. 199) for procuring sup-
plies for the support of the penitentiary is exclusive, and the
board of public lands and buildings cannot delegate to an agent
of their own selection the disbursement of money appropriated
for that purpose.

13. ———: ———: ———: CONSTRUCTION OF CONTRACT. Contract relied upon by respondents examined, and *held* a mere appointment of B., the alleged contractor, as agent of the state to lease the convict labor to third parties and to disburse the funds appropriated for the support of the penitentiary.

14. State Treasurer: PUBLIC FUNDS. The state treasurer, and not the chairman of the board of public lands and buildings, is charged with the general duty of receiving and disbursing the public funds, hence the latter is not chargeable upon his official bond with money of which the former is the lawful custodian.

15. Contracts: CONSIDERATION. Reciprocal promises as the basis of a valid agreement must be equally obligatory upon the parties, so that each may have an action thereon; otherwise such agreement is *nudum pactum*.

ORIGINAL application for *mandamus* to compel the members of the state board of purchase and supplies to meet with the relator and make estimates, and purchase provisions and supplies for the penitentiary. *Writ allowed.*

*Darnall & Kirkpatrick,* for relator:

Reference was made to the following cases: *White v. City of Lincoln,* 5 Neb., 505; *City of Tecumseh v. Phillips,* 5 Neb., 305; *Ives v. Norris,* 13 Neb., 254; *Miller v. Hurford,* 11 Neb., 381; *Dawson County v. McNamar,* 10 Neb., 276; *Trumble v. Trumble,* 37 Neb., 340; *People v. Denahy,* 20 Mich., 349; *Weigel v. City of Hastings,* 29 Neb., 379; *State v. Nomland,* 3 N. Dak., 427; *State v. Bartley,* 41 Neb., 277; *State v. Wallichs,* 12 Neb., 407, 15 Neb., 457, 609; *State v. Board of Public Lands & Buildings,* 7 Neb., 42; *State v. Bacon,* 6 Neb., 286; *In re Board of Public Lands & Buildings,* 18 Neb., 340, 37 Neb., 425; *Lawson v. Gibson,* 18 Neb., 137; *State v. Babcock,* 21 Neb., 599; *Stone v. Green,* 3 Hill [N. Y.], 472; *State v. Maccuaig,* 8 Neb., 215; *State v. Howe,* 28 Neb., 618.

*A. S. Churchill, Attorney General,* and *George A. Day, Deputy Attorney General,* contra, cited: *State v. Stout,* 7 Neb., 89; *State v. Lancaster County Bank,* 8 Neb., 218; *In*

*re Appropriations,* 25 Neb., 665; *Van Horn v. State,* 46 Neb., 62; *State v. Whittemore,* 12 Neb., 252; *State v. Ream,* 16 Neb., 681; *Stricklett v. State,* 31 Neb., 674; *Smails v. White,* 4 Neb., 353; *Sovereign v. State,* 7 Neb., 409; *People v. Mahaney,* 13 Mich., 481; *State v. Bemis,* 45 Neb., 724; *Lewis v. Stout,* 22 Wis., 236; *Commonwealth v. Green,* 58 Pa. St., 226; *Board of Supervisors v. Heenan,* 2 Minn., 281; *Bright v. McCullough,* 27 Ind., 223; *Indiana C. R. Co. v. Potts,* 7 Ind., 681; *City of St. Louis v. Tiefel,* 42 Mo., 589; *Curry v. Elvires,* 3 Vroom [N. J.], 363; *State v. Squires,* 26 Ia., 345; *State v. County Judge of Davis County,* 2 Ia., 280.

. POST, C. J.

. This is an original application for a writ of *mandamus,* on the relation of George W. Leidigh, as warden of the state penitentiary, to compel the respondents, as members of the board of purchase and supplies, to meet with the relator as such warden and make an estimate of the supplies necessary for the maintenance of said penitentiary for the current quarter, to advertise for bids therefor, and make contracts for such supplies in accordance with the provisions of the act approved February 15, 1877. (Compiled Statutes [ed. 1895], sec. 2, art. 12, ch. 83.) It is by the act mentioned made the duty of said board, consisting of the governor, commissioner of public lands and buildings, secretary of state, treasurer, and attorney general, at least one month previous to the first days of January, April, July, and October of each year, to meet with the warden of the penitentiary and 'superintendent of each of the asylums or other public institutions and determine the supplies neces- sary for such institutions for the quarter next ensuing, and which shall be contracted for by said board in the manner therein prescribed after advertisement in a newspaper having a general circulation in the state. It is further provided that no bids shall be considered unless accompanied

by the bonds of the proposed contractors in such amount and with such conditions as the board may prescribe, and that all supplies not furnished in accordance with the provisions of said act shall be purchased under the written instructions of said board.    The respondents, except the governor (who refuses to join in resisting the relator's demand) having waived the issuance and service of the alternative writ, have filed a pleading in the nature of an answer, in which it is in substance alleged that the board of public lands and buildings, in the exercise of the authority conferred by the constitution and statutes of the state, on the 3d day of September, 1895, leased to A. D. Beemer, until the last day of the next session of the legislature, all of the convict labor in said prison, together with the grounds, yards, shops, and machinery pertaining thereto; that one of the considerations for said lease was the agreement by the said Beemer to suitably feed and clothe the convicts confined in said prison.    It is further alleged that said lessee has been since the date named, and now is, ready and willing to furnish all of the supplies required for said prison and the convicts therein as by his lease provided, but that the relator has ever since said date refused, and still refuses, to accept from said lessee any supplies, or to permit him to employ any of said convicts.    The lease above mentioned is here set out at length:

"This agreement, made and entered into at Lincoln, Nebraska, on this 3d day of September, A. D. 1895, by and between the state of Nebraska and H. C. Russell, J. A. Piper, A. S. Churchill, and J. S. Bartley, for and on behalf of said state, as the board of public lands and buildings of the state of Nebraska, parties of the first part, and A. D. Beemer, of Beemer, Cuming county, Nebraska, party of the second part,

"Witnesseth, that the said parties of the first part hereby grant, let, and lease to A. D. Beemer all of the property inventoried by the appraisors and umpire and purchased of

William H. Dorgan for the use and benefit of the Nebraska state penitentiary, also the labor of the prisoners confined in the penitentiary of the state of Nebraska, and all the grounds, shops, yards, and buildings and outbuildings connected with the same, and the appurtenances thereunto belonging (not hereinafter reserved), and all property belonging to the state, and the machinery for running the several branches of industry and used for the care and maintenance of the convicts therein until the last day of the session of the next session of the legislature, and agree to pay to the said A. D. Beemer the cost of feeding, clothing, and necessary expense for the care of said prisoners, and to pay the salaries of the warden, deputy warden, surgeon, and chaplain, turnkeys, usher, night watch, cellhouse keepers, keeper in kitchen, and all necessary guards for the care and control of said prison and prisoners, for which the said first party agrees to pay not to exceed forty cents per day for each convict. In consideration whereof the said A. D. Beemer is to secure and furnish all possible labor for the convicts confined in said prison and to keep said convicts employed at the best possible wages, and to use his best energy and endeavor to keep them so employed, and to conduct the business of the prison in an energetic and economical manner, and to make all necessary improvements in said prison that the board of public lands and buildings may direct, to keep all the buildings, shops, yards, and grounds in a good condition, and to preserve the same from all possible damages. That the said A. D. Beemer is to have and exercise exclusive right to assign convicts to trades and occupations, to the running and management of all machinery belonging to the state and under his control, and shall see that the food furnished said prisoners is wholesome, and the clothing furnished is suitable to the comfort and health of the prisoners. For all purposes between the parties to this contract ten (10) hours shall be regarded as constituting a day's labor.

"The said A. D. Beemer, party of the second part, shall make a report on the 1st and 15th days of each month to the chairman of the board of public lands and buildings of all moneys received and paid out by him, of all his acts and doings connected with his management and control of said prison and prisoners, and to pay over to said chairman all moneys in his hands on the 1st day of each month when required by the board, less $250 per month; provided that not more than $3,000 shall be retained in any one year; and provided further, that said Beemer shall keep and have a competent book-keeper, to be paid out of the $3,000 retained by him. He shall keep an inventory of all property coming into his hands as lessee and turn over or account for the same at the expiration of his lease in as good condition as the same now is, reasonable damage by use, wear and tear, loss by fire, the acts of God, and public enemies excepted. He shall [have] the full right to control and manage all property and machinery necessary for the employment, care, and maintenance of the convicts.

"The employment of outside labor by the lessee shall be subject to the approval of the board of public lands and buildings.

"The state reserves the right to make any and all temporary or permanent improvements and buildings pertaining in any manner to the penitentiary or any part or portion thereof, and the right to use any of the prisoners, grounds, and buildings free of charge during the time of construction.

"This contract shall take effect and be in force from and after the 3d of September, A. D. 1895, and the execution of a bond by said A. D. Beemer, with good and sufficient surety to the satisfaction and approval of the board of public lands and buildings of the state of Nebraska, in the penal sum of one hundred thousand ($100,000) dollars, conditioned for the faithful performance by the said A. D. Beemer of all the stipulations and agreements on his be-

half in this contract contained. The state reserves for the use of the officers and guards the following rooms, to-wit: Rooms used by the warden in 1894, two rooms for the use of the deputy warden, the warden's office and library, and necessary rooms for the guards, said rooms to be in the main building.

"Either party reserves the right to cancel and annul said contract at any time, upon giving thirty (30) days' notice. The party of the first part guaranties the preservation of strict discipline, and for that purpose and pursuant to law retain the general management and control of said penitentiary, penitentiary grounds and convicts, and the right to employ officers and guards and to fix the salaries of all not now fixed by law. The state further reserves the right to say who shall be boarded at the expense of the state, and to fix the price to be paid for board if charge is made for the same.

"Signed, sealed, and delivered this 3d day of September, A. D. 1895.　　　　A. D. BEEMER, *Lessee.*

"H. C. RUSSELL,
"*Com. P. L. & B.*,
"J. A. PIPER,
"*Sec'y B. of P. L. & B.,*
"J. S. BARTLEY,
"*State Treasurer,*
"A. S. CHURCHILL,
"*Att'y General,*
"*Board of Public Lands and Buildings.*
"Signed in presence of
"RECEA BIGLER.
"BRAD. P. COOK.

"It is understood that the money to be turned over by me as herein stated includes all money coming into my hands as lessee from contractors or the forty (40) cents per capita received from the state less the amount herein stated.
"A. D. BEEMER."

The relator's right to maintain this action is challenged by respondents, and defended upon two grounds, viz., (1) that such power is expressly conferred by statute; (2) that the object of the action is the enforcement of a public duty, in which the relator has, by virtue of his office as warden, a direct interest, and as such is entitled to prosecute the action in behalf of the state.    The first contention is based upon the terms of the act of 1870 (General Statutes, p. 1031, ch. 76), under which the penitentiary was created. That act, in addition to the appropriation of funds for the erection and maintenance of the penitentiary, provides for the appointment by the governor of a warden who is declared to be the principal keeper of the prison, who is required to remain in constant attendance thereat, except when engaged in the performance of some other duty of his office, and to " exercise general supervision over and give necessary directions to the keepers and guards, examine whether they have been vigilant in the discharge of their respective duties, examine daily into the health of the prisoners and take charge of the real and personal estate belonging to or connected with the penitentiary." (General Statutes, p. 1038, ch. 76, sec. 31.)    It is by section 32 of said act provided that all transactions and dealings of the prison should be conducted in the name of the warden, " who shall be capable in law of suing and being sued in all courts and places in all matters concerning the said prison by his name of office," etc. (General Statutes, p. 1038, ch. 76, sec. 32.)

The section last mentioned, it is claimed, conflicts with the provisions of section 19, article 5, of the constitution of 1875, and the act of February 13, 1877, " Establishing a board of public lands and buildings of the state of Nebraska, and defining their duties." (Session Laws, 1877, p. 188.)    The constitutional provision mentioned reads as follows: "The commissioner of public lands and buildings, the secretary of state, treasurer, and attorney general shall

form a board, which shall have general supervision and control of all the buildings, grounds, and lands of the state, the state prison, asylums, and all other institutions thereof, except those for educational purposes, and shall perform such duties and be subject to such rules and regulations as may be prescribed by law." Section 1 of the act of 1877 provides that the officers above enumerated shall hereafter be known in law as "the board of public lands and buildings," and "shall have general supervision and control of all the public lands, lots and grounds, and all institutions, buildings, and all the grounds thereto, now owned or that may hereafter be acquired by the state, including the saline lands, * * * the state capitol building and grounds, the state penitentiary and grounds, the state hospital for the insane and grounds," etc. (Session Laws, 1877, p. 189, sec. 1.) Section 3 provides that said board "shall have general custody and charge of all buildings and institutions and the grounds thereto coming under the provisions of this act, and shall be responsible for the proper keeping and repair of the same," etc. Section 4 provides that said board "shall have power, under the restrictions of this act, to direct the general management of all the said institutions, and be responsible for the proper disbursement of the funds appropriated for their maintenance, and shall have reviewing power over the acts of the officers of such institutions and shall * * * audit all accounts of such officers, including the accounts of the commissioner of public lands and buildings, except his salary." The evident purpose of these provisions is to invest the board of public lands and buildings with the general control and management of the institutions to which they apply, accompanied by the responsibility which is a necessary incident of the power thus conferred. They are, too, in obvious and irreconcilable conflict with the provision of the prior act for the prosecution of actions relating to the management of the penitentiary in the name of the warden.

But independent of the statute we are satisfied that the relator has such a direct interest in the subject of the controversy as entitles him to prosecute this action in the name of the state. That it is the duty of the board of purchase and supplies to provide suitable food and clothing for the convicts committed to relator's charge is a proposition not controverted by respondents. Nor can we conceive of a more appropriate means of enforcing that duty in case of default than by a proceeding on the relation of the party charged with the safe keeping as well as the health and comfort of the convicts. That view, it seems, harmonizes with the spirit of the Code as well as the former utterances of this court. (*State v. Stearns*, 11 Neb., 104; *State v. Peacock*, 15 Neb., 442; *State v. Matley*, 17 Neb., 564; *State v. Farney*, 36 Neb., 537.)

The reliance of the respondents is, as already appears, the undertaking of Beemer, the alleged lessee, to maintain the prisoners. The relator, on the other hand, while conceding the duty of the board of public lands and buildings to let to contractors, on the best attainable terms, the labor of the convicts, denies the authority of said board to lease the penitentiary, the grounds thereto belonging, or the property of the state therein.

Since it is important to ascertain the source and limit of the power conferred upon the board with respect to the subject in hand, we will briefly notice the several contentions of the respondents, although not exactly in the order presented.

It is in the first place asserted that authority for said contract is found in section 17 of the act of February 13, 1877, heretofore referred to, creating the board of public lands and buildings; but in that view we cannot concur. It is sufficient, without quoting the section named, that it provides for the leasing, after advertising as therein provided, of the penitentiary and grounds, and the convict labor, for a period not exceeding ten years. The power

thus conferred is not a continuing one, but was, on the contrary, exhausted with a single user. Such is the obvious and necessary construction of the language therein employed.

It is next claimed that said contract is authorized by section 5 of the act of 1895, entitled "An act to annul a contract between the state of Nebraska and W. H. Dorgan, alleged assignee of C. W. Mosher, for leasing the penitentiary, penitentiary grounds, and convict labor of the state of Nebraska, * * * and to repeal all acts and parts of acts in conflict with the provisions of this act." (Session Laws, 1895, p. 237, ch. 66.) It is by section 5 thereof provided, "That the board of public lands and buildings shall have power and are hereby directed to manage the state penitentiary, and the said board is hereby authorized and empowered to lease the labor of convicts to responsible persons, when in their judgment the best interests of the state would be subserved thereby; *Provided*, No contract made shall extend beyond the last day of the session of the next session of the legislature." The section quoted is, it is claimed, inimical to the provision of section 11, article 3, of the constitution, viz.: "No bill shall contain more than one subject, and the same shall be clearly expressed in its title." Turning again to the title of said act we find the words "for leasing the penitentiary, penitentiary grounds, and convict labor," separated from the remaining portions thereof by commas, indicating that it was intended as an independent provision; but an examination of the whole title, together with the lengthy preamble accompanying it, leads to the conclusion that the words last quoted are descriptive merely of the contract between the state and Dorgan, as assignee of Mosher, and not embracing a distinct and separate subject of legislation. The punctuation of statutes, presumably the work of the engrosser or publisher, is of little value in their interpretation and is frequently altogether disregarded by the courts. (Sedgwick,

Construction of Statutory & Constitutional Law, p. 223;
*Hammock v. Loan & Trust Co.*, 105 U. S., 77; *Gyger's
Estate*, 65 Pa. St., 311; *Doe v. Martin*, 4 T. R. [Eng.], 65.)
The preamble, on the contrary, while not a part of the act,
will always be consulted in case of doubt or ambiguity, in
order to determine the legislative intention, and has for that
purpose been held entitled to greater consideration than the
title itself. (Bishop, Statutory Crimes, sec. 48; *Jackson v.
Gilchrist*, 15 Johns. [N. Y.], 89; *Yazoo & M. V. R. Co.
v. Thomas*, 132 U. S., 174.)   The preamble in this instance
is in the usual form, reciting the history of the contract
between Mosher and the state, the assignment thereof by
the former to Dorgan, and concluding as follows: "And
whereas it is desirable that said contract should be annulled
and set aside before the same expires by limitation; there-
fore, be it enacted, etc." (Session Laws, 1895, p. 237, ch.
66.)   It contains no reference to a further letting of the
penitentiary or the convict labor.   We think, therefore,
that the title quoted must be held to contemplate merely the
abrogation of the Dorgan contract, and not including the
provision relied upon. (*State v. Hurds*, 19 Neb., 317;
*Trumble v. Trumble*, 37 Neb., 340, and authorities cited.)
Respondents also cite section 19, article 5, of the constitu-
tion above quoted, and the act creating the board of public
lands and buildings in justification of their actions in the
premises.   The constitution, as we have seen, provides that
said board shall have the general supervision and control
over all the buildings, grounds, and lands of the state, the
state prison, asylums, etc., and shall perform such duties
and be subject to such rules and regulations as may be pre-
scribed by law.   And by the statute mentioned said board
is invested with general custody of all buildings and insti-
tutions, including the penitentiary, with power to direct the
general management thereof.   The authority of the board
by virtue of these provisions to lease the convict labor, with
the machinery and property described in the agreement

44

with Beemer, cannot be doubted. But if the language in question was doubtful or ambiguous we would, from motives of humanity alone, hesitate long before adopting a construction which would result in the enforced idleness of the helpless convicts of the state.

It is next objected that the contract is void for the reason that it contemplates the turning over to Beemer of the entire control of the penitentiary, and is in brief a usurpation of the powers conferred by law upon the warden. The first inquiry suggested by that contention is, what are the powers of the warden, and what is his relation to the board of public lands and buildings? His authority, it must be remembered, so far as it relates to the government of the penitentiary, is defined by sections 15 and 31 of the act of 1870, which provide (1) that he shall be the principal keeper of the prison; (2) that he shall exercise general supervision over the keepers and guards, examine daily into the health of the prisoners, and take charge of the real and personal estate belonging to or connected with the prison. (General Statutes, 1873, pp. 1036, 1038, ch. 76.) But it was, as we have seen, provided by said act that the penitentiary should be erected and continued under the direction and control of a board of inspectors therein provided for. The obvious effect of the constitutional provision creating the board of public lands and buildings, and subsequent legislation thereunder, was to abolish the board of inspectors and invest the former with all the powers and functions of the latter with respect to the control and management of the penitentiary. The warden, therefore, continues to be, as originally designed, simply the keeper of the penitentiary, subject to the management and control of the board of public lands and buildings. We must not be understood as intimating that a lessee or contractor can, even with the assent of the state board, usurp any of the powers of the warden, although it is clear that he may, and doubtless should, be accorded such privileges consistent

with the rules prescribed for the discipline of the prison
and the health and safety of the convicts as may be neces-
sary to carry into execution his agreement with the state.
The objection to the contract on the ground that it is an
invasion of power conferred by law upon the relator as
warden of the penitentiary is accordingly without merit.

Again, it is contended that the agreement under considera-
tion is a complete abdication by the board of its constitu-
tional functions, being a surrender to Beemer both of the
management of the penitentiary and the funds appropriated
for its maintenance.    A more critical examination of the
agreement under consideration satisfies us that while it is
therein denominated a lease, such appellation is a mis-
nomer.    Said agreement is in our judgment susceptible of
but one construction, viz., the appointment by the board
of public lands and buildings of Beemer in behalf of the
state for a fixed compensation, to lease the convict labor
and to disburse the money appropriated for the main-
tenance of the penitentiary.    That such is its true inter-
pretation is apparent from the undertaking therein to pay
Beemer, but the cost of feeding and clothing the prisoners,
not exceeding forty cents each per day, and the undertak-
ing of the alleged contractor to pay over to the chairman
of the board all moneys received by him, the proceeds of
the convict labor, less the sum of $3,000, to be retained as
compensation for himself and book-keeper.    The board of
public lands and buildings is composed of the executive
officers of the state, who, in addition to their ordinary du-
ties, are members of various other boards, each claiming a
considerable portion of their time and attention.    For
them to personally direct the management in detail of the
dozen different state institutions is, as we well know, im-
possible, hence they must, from the necessities of the case,
transact much of the business pertaining to such institu-
tions through agents of their own creation.    But while the
statutes regulating their duties should be liberally con-

strued in their favor, we are not at liberty to disregard one provision of the law simply in order to render the execution of others more effective. There being no conditions imposed upon the power of the board with respect to leasing of the convict labor, it may be done through the medium of an agent appointed for that purpose. Nor do we doubt the power of the board of public lands and buildings to provide by contract for the feeding and clothing of the convicts as one of the conditions for the leasing of their labor, and such an agreement with a responsible lessee, who is ready and willing to fulfill the conditions of his obligation, would be a sufficient justification in a proceeding of this character. But Beemer's undertaking being merely to maintain the convicts with funds to be advanced by the state, and to let their labor to third persons, presents no case for the application of the rule stated, or justification of the refusal of the respondents to furnish the needed supplies in accordance with the positive requirements of the act defining their duties as members of the board of purchase and supplies, provided of course the relator is in a position to allege the invalidity of said contract in this proceeding, a question which will be hereafter considered. Another inherent vice of said contract is the provision therein for the payment by Beemer to the chairman of the board of public lands and buildings of all money realized from the leasing of the prison labor. Section 2, article 4, chapter 83, Compiled Statutes, reads as follows: "It shall be the duty of the state treasurer: First—To receive and keep all moneys of the state not expressly required to be received and kept by some other person. Second—To disburse the public money upon warrants drawn upon the state treasury according to law, and not otherwise. Third—To keep a just, true, and comprehensive account of all moneys received and disbursed," etc. The officers comprising the board of public lands and buildings are required to give bond conditioned for the faithful discharge

of their official duties, but upon none of them does the
law impose the responsibility of receiving and disbursing
public funds.   That board, we have held, is required to
audit all claims for money disbursed for the support of
the public institutions of the state.  (*In re Board of Pub-
lic Lands & Buildings,* 37 Neb., 425.)   But the act by
which it was created provides for the payment of accounts
when examined and allowed by it on warrants drawn by
the auditor upon the state treasurer against the proper
fund or appropriation.   It is argued that money thus paid
over would not remain in the custody of the chairman of
the board of public lands and buildings, but would be used
to defray the current expenses of the prison, thereby sav-
ing to the state so much of the fund appropriated for
that purpose; but it nevertheless imposes upon the offi-
cer named a liability not within the contemplation of the
constitution or the statute defining his duties, and for which
he would not be answerable upon his official bond.   The
power of the legislature to impose upon sureties of public
officers new and additional burdens, is a question not now
before us.   But it is clear, both from principle and au-
thority, that an action would not lie upon the bond of the
officer named, to-wit, the commissioners of public lands and
buildings, for money received by him pursuant to the con-
tract here involved.   Such an obligation on his part is be-
yond and foreign to the liability assumed by his sureties.
(*Manufacturers Nat. Bank of Newark v. Dickerson,* 41 N.
J. Law, 448; *People v. Pennock,* 60 N. Y., 421; *White
Sewing Machine Co. v. Mullins,* 41 Mich., 339; *City of
Lafayette v. James,* 92 Ind., 240; Murfree, Official Bonds,
sec. 650; 2 Brandt, Suretyship & Guaranty, secs. 528 and
529, and authorities cited.)

It remains to be determined whether the relator shall in
this proceeding be permitted to assert the invalidity of the
contract upon which the respondents rest their defense.
That question we were from the first impression strongly

inclined to resolve in the negative in view of the allegation that Beemer is now ready and willing to provide for the support of the prisoners; but further reflection has led to a different conclusion, for which our reasons will be briefly stated. This proceeding is not for the enforcement of a mere private right of the relator, but of a duty which the respondents owe to the state, while their defense rests upon the executory agreement of a third party, by which the latter undertakes to pay over money thereby received by him in behalf of the state, not to the treasurer, who alone is authorized to receive and disburse it, but to an officer whose action in that regard is wholly unauthorized and for which he would not, as already shown, be answerable on his official bond. It is elementary law that reciprocal promises as the basis of a valid agreement are equally obligatory upon the parties, so that each may have an action thereon. Otherwise such an agreement is *nudum pactum*. (Pollock, Contracts, p. 176*; Addison, Contracts, sec. 18.) It is not enough that Beemer may at this time express a willingness to account for money received by him under said contract to the commissioner of public lands and buildings, since his obligation to the state could be discharged only by means of payment in full of such funds to the officer authorized by law to receive them. The result of this reasoning is that the contract relied upon is void for want of mutuality and is not a sufficient justification of the action of the respondents, as members of the board of purchase and supplies, in refusing to provide for the maintenance of the penitentiary in the manner prescribed by law. The peremptory writ will accordingly issue as prayed.

WRIT ALLOWED.