STATE OF NEBRASKA, EX REL. EDWARD D. DAVIS, RELATOR,
   v. PETER MORTENSEN ET AL., CONSTITUTING THE BOARD
   OF PUBLIC LANDS AND BUILDINGS OF THE STATE OF
   NEBRASKA, RESPONDENTS.

FILED JUNE 11, 1903.   No. 13,207.

1. **Contract:** CONSTRUCTION. A construction that will completely
   emasculate a clause of a contract will not be adopted, if any other
   reasonable construction is admissible.

2. **Board of Public Lands and Buildings:** MANAGEMENT OF PENITEN-
   TIARY. The board of public lands and buildings is vested with the
   general management and control of the penitentiary and may,
   in its discretion, let out by contract the labor of any or all the
   convicts.

3. ————: CONTRACT FOR CONVICT LABOR. A written contract for the
   hiring of convict labor, drawn under the provisions of section 16,
   chapter 86, Compiled Statutes, is not valid unless executed by the
   warden of the penitentiary, and approved by the governor and the
   board of public lands and buildings.

4. ————. The alleged contract upon which this action is grounded
   would, if valid, impose no active duties upon the board of public
   lands and buildings.

5. **Mandamus:** PUBLIC CORPORATION. The courts will not by means of
   the writ of mandamus compel municipal or public corporations to
   perform specifically their ordinary business contracts.

6. **Action at Law Against State.** A sovereign state can not be sued in
   its own courts without its consent. This state has in a measure
   waived its prerogative; it has given its consent to be sued, but
   only in the cases mentioned in section 1106 of the code. The
   present action does not fall within the provisions of that section.

7. ————: JURISDICTION. This court has, under the existing law, no
   jurisdiction of an action brought against the state to enforce
   specific performance of a contract, or for any other purpose.

8. ————. A contract with the board of public lands and buildings for
   the leasing of convict labor is in substance a contract with the
   state; and an action against the members of the board to compel
   specific performance of such a contract is in substance an action
   against the state.

9. **Board Acts for State.** The state, like an individual or private cor-
   poration, may refuse to keep its engagements; and the board of
   public lands and buildings, as a governmental agency having full
   authority in all matters relating to the management of the
   penitentiary, is vested with power to determine whether a con-

tract for the leasing of convict labor shall be kept or broken. The action of the members of the board in the matter is the action of the state; their determination is its determination.

ORIGINAL application for a writ of mandamus to compel the state board of public lands and buildings to perform a contract for the hiring of convict labor. *Writ denied.*

*George E. Hager,* for relator.

*Frank N. Prout, Attorney General,* and *Charles O. Whedon, contra.*

SULLIVAN, C. J.

In this case the relator, Davis, seeks by means of the writ of mandamus to compel respondents, who constitute the state board of public lands and buildings, to perform a contract for the hiring of convict labor. Two members of the board, Mr. Mortensen and Mr. Folmer, admit the execution of the alleged contract, assert its validity, and say they are ready and willing to comply with its terms. The other two members, Mr. Marsh and Mr. Prout, in effect, deny that the contract is valid and insist that, if valid, it cannot be enforced by mandamus. The Lee Broom & Duster Company, a corporation having a prior contract for convict labor, has intervened in the action, on the theory that the allowance of the writ would be prejudicial to its rights. The intervener's contract is in part as follows:

"Articles of agreement made in duplicate and entered into this first day of April, A. D. 1902, by and between E. D. Davis, Warden of the Nebraska State Penitentiary, party of the first part, and Lee Broom & Duster Co., incorporated, of Davenport, Iowa, party of the second part, witnesseth: That said parties agree as follows:

"1. That party of the first part shall furnish to said party of the second part, one hundred and twenty-five (125) convicts, in the Nebraska State Penitentiary, to carry on the broom and whisk-broom business for manufacturing purposes.

"2. That should party of the second part have use for more than 125 convicts, then, at its option, party of the first part shall furnish party of the second part additional convicts not exceeding in number 250, in preference to any other employment of such convicts, save for such work as convicts are now employed in and about the prison, in the performance of menial prison duties."

It can hardly be doubted that by the second clause of this contract the option is given to the intervener and not to the warden, who is described as the party of the first part. It would be an exceedingly awkward and inaccurate use of language to say that the warden shall, at his option, etc. Besides such a construction is, on practical grounds, inadmissible. Give the warden the option and the intervener the right to determine whether it has use for additional convicts, and the clause is completely emasculated.

There are now in the penitentiary 280 convicts, 100 of whom are performing menial prison duties. The others are in the service of the intervener. The contract which the relator is seeking to enforce is as follows:

"This article of agreement made in triplicate copies and entered into this first day of April, 1903, by and between A. D. Beemer, Warden of the Nebraska State Penitentiary, party of the first part, and Edward D. Davis, party of the second part, witnesseth:

"1. That said party of the first part shall furnish to said party of the second part thirty-five (35) convicts now confined in the Nebraska State Penitentiary, to carry on the business of a button manufacturing company.

"2. That during the continuance of this contract no convict assigned to said party of the second part shall be taken away from him and assigned to other trades without the consent of both parties hereto.

"3. That during the continuance of this contract whether or not party of the second part shall be working convicts in excess of this contract or not, no convict once assigned to said second party shall be taken from him and assigned

to other work without the consent of the party of the second part.

"4. The said party of the second part shall have the exclusive control of convicts assigned to this contract subject to the rules and regulations and discipline of the Nebraska State Penitentiary.

"5. Convicts who shall be sick or undergoing punishment shall be returned to second party when fit for duty.

"6. A day's labor between October first and April first shall be eight hours and between April first and October first shall be ten hours provided, that when convicts are doing task work, then whenever any convict shall have completed his day's work, if it be before the end of the day's work, it is agreed that he has completed a full day's [work] and payment shall be made by the said second party for the same as a full day's work.

"7. That when any convict is withdrawn from this contract by reason of death or pardon or expiration of time of sentence, the party of the first part shall assign an equal number of other convicts, which shall be selected by said party of the second part from those unemployed.

"8. That the day's labor under this contract shall be each day of the year excepting Sundays and all legal holidays.

"9. The party of the second part shall have the exclusive right to maintain a button factory for manufacturing purposes in said penitentiary with said convict labor.

"10. The party of the first part shall assign to the party of the second part, suitable room, in which to manufacture buttons, to card and prepare them for shipment and furnish steam and heat and power not to exceed one-horse power to each five (5) men employed, which shall be furnished said party of the second part free of charge, but any additional horse power furnished at the request of the second party, shall be furnished at the rate of fifty cents per horse power, per day, over and above the one horse power to each five convicts.

"11. That all work performed under this contract shall

be under the supervision of a foreman furnished by party of the second part, and the party of the first part guarantees unto the party of the second part, that all work shall be executed as directed by said foreman, and that under no circumstances will the warden allow prisoners to slight their work or turn out poor careless work; party of the second part shall not be compelled to pay for such slighting of the work, or for careless work so as aforesaid.

"12. That should any convict employed by the party of the second part be unable to learn and master the button trade or should any convict turn out poor work, he shall be transferred and the party of the second part shall have the privilege of selecting a suitable convict from those unemployed to fill his place.

"13. That should any convict employed by the party of the second part be or become unable to perform his daily task on account of sickness, inability or other reason, or that when convicts are first taken to work and are unable to complete their daily task, party of the second part shall pay party of the first part only for that portion of the task or day's work, performed by said convict on that day.

"14. That said party of the first part shall provide necessary guard and keepers for the supervision of the convicts employed under this contract free of expense to the party of the second part, which said guards and keepers shall at all times remain under the official control of the warden of said penitentiary, and are to be selected, retained or discharged by said warden.

"15. Party of the first part shall keep a runner in said shop to perform duties for the state, such as carrying reports, books, etc., to deputy warden's office; gathering and distributing laundry for convicts, carrying around wash water twice a day; cleaning up shops and closets daily and other necessary jobs that the guard may have for them to do, and should the state runner have any surplus time he shall perform similar duties for the party of the second part.

"16. That said party of the second part shall pay to said

party of the first part as full compensation for the labor of the convicts employed under this contract, and power to operate the machinery used in the manufacture of buttons, and to properly heat the room occupied by such manufactory in said prison the sum of fifty-five (55) cents per day for each and every convict, which sum shall be received as satisfaction in full except for additional power furnished as provided for in section 10 of this article.

"17. The party of the second part agrees to pay the party of the first part for the labor of convicts hired under this contract on the 10th day of each month succeeding the one in which the labor or service has been performed.

"18.               TASK FOR CUTTERS.

"That the daily task on the different grades of buttons shall be as follows:

CUTTING DISKS OR BLANKS OUT OF SHELLS.

| | | |
|---|---|---|
| 16 line............117 oz............ | task. |
| 18 line...........124 oz........... | " |
| 20 line...........130 oz........... | " |
| 22 line...........148 oz........... | " |
| 24 line...........160 oz........... | " |

"Provided always that all the cutting of disks or blanks of shell shall be done so that there shall be no waste of good material of shell. The cutting shall be close and no disk or blank shall be cut out of the shell under thickness of three lines, known in button manufacturing rules.

FACING BUTTONS, EXTRA FINE, 45 GROSS TASK.

No. 2 supers...............40 gross task.
No. 3    "    ...............35   "     "

DRILLING.

All 2 holes................60 gross task.
All 4 holes................50   "     "

"19. All tasks or day's work not herein above mentioned or all new tasks or day's work needed by party of the second part shall be fixed in same proportion as the foregoing tasks by the warden, and party of the second part shall have the right at any time to put in any new or improved

machinery, and the warden shall arrange a task satisfactory to the party of the second part to be performed on such machines for the party of the second part.

"20. That in case of a serious fire or other inevitable accident in prison shops, in order to resume operations, the warden shall allow the party of the second part a reasonable time to procure machinery and material for manufacturing purposes.

"21. That this contract is drawn with the provision that in case the United States Government, or the State of Nebraska, shall create laws hostile to prison made goods, or restrict the sale of same, or to brand the same 'Prison Made' then the party of the second part shall not be beholden to pay the within mentioned price for said convict labor, and said second party may have the privilege or option to cancel this contract.

"22. This contract shall take effect from and after the 15th day of April, 1903, and remain in force until the 15th day of April, 1904, with the privilege to the party of the second part of continuing the same for one year further unless sooner terminated by mutual consent.

"23. This agreement to be binding upon the heirs, executors and assigns and successors of the respective parties hereto.

"In witness whereof the parties hereto have hereunto set their hands the year first above mentioned.

"(Signed)        E. D. DAVIS,
"————————,
"*Warden Nebr. State Penitentiary.*

"In presence of

"Approved by the board of public lands and buildings including the governor of the state of Nebraska.

"———— ————,
"*Governor.*
"(Signed)        PETER MORTENSEN,
"*State Treasurer.*
"(Signed)        GEO. W. MARSH,
"*Secretary of State*

State v. Mortensen.

"(Signed)          F. N. Prout,
                   *"Attorney  General.*
"(Signed)          Geo. D. Follmer,
    *"Commissioner  of  Public  Lands  and  Buildings."*

The day after the foregoing instrument was signed
the intervener exercised the option given it by the second
clause of its contract and notified the warden of the peni-
tentiary that it had use for seventy additional convicts.
One of the grounds upon which relator's application is
resisted is that compliance with the second contract would
put the state under the necessity of violating the first.  In
our opinion this position is not tenable.  The intervener
has, under the contract, no claim on the convicts now in
the penitentiary; they are engaged in the performance of
menial prison duties and, consequently, it would not be
injured by the assignment of them to the relator.  Whether
by reason of such an assignment the intervener would be-
come entitled to the service of new convicts, we need not
determine; that question is not before us.  The board of
public lands and buildings had authority to let out the serv-
ices of any or all the convicts.  If, therefore, the relator's
contract had been duly executed it would have been valid.
*State  v.  Holcomb,* 46 Neb. 612.  But it was not duly exe-
cuted.  It was undoubtedly drawn under section 16, chapter
86, Compiled Statutes (Annotated Statutes, 9699), which
is as follows:

"It shall be the duty of the warden, with the approval
of the governor and the prison inspectors, to provide
labor for the prisoners and keep them in industrial em-
ployment, so far as possible and for the greatest practical
profit to the state and the general welfare and health of
the prisoners.  The warden may manufacture articles for
use in the prison and all other state institutions, or let the
service of prisoners for such purpose, and whenever there
shall be any surplus of prison labor which can not be so
utilized to advantage or profit, the warden may let out the
service of such unemployed or idle prisoners for a term of

years, not exceeding three years at any one time or for any one contract; and he shall be charged with the duty of collecting for such services and collecting all other debts due to the state under his administration. When the service of convicts confined in the penitentiary is let out by contract, the warden shall be at all times charged with the custody, discipline, control and safe keeping of such prisoners and provide them with board and clothing. As rapidly as it may profitably be done, the state shall provide for the employment of the labor of the convicts on its own account to the end that the state may eventually provide means for the employment of all prisoners without the intervention of contractors; and the warden shall be charged with the duty of making the state prison as nearly self-sustaining as possible and of promoting, as far as circumstances will permit, the welfare of the convicts."

This section clearly contemplates a contract to be made by the warden and approved by the governor and the board of public lands and buildings. The relator does not allege that he made any contract with the warden or that the instrument above set out received executive approval. It is true that in the separate answer of Mr. Mortensen and Mr. Follmer it is admitted that the warden and governor were present when the contract was made and agreed to it, but this admission is not binding upon either Mr. Marsh or Mr. Prout and can not, therefore, be regarded as an admission by the board. Upon the whole record it is evident that the signature of the warden and the approval of the governor were necessary to the completion of the contract.

But assuming that the contract is valid we do not see how it can be enforced by mandamus against respondents. It purports to be, not their contract, but the contract of the warden; the duties and obligations which it imposes are imposed upon him and not upon them. They have not obstructed its enforcement; neither have they done, nor refused to do, any thing in violation of its terms and consequently they could not, in any view of the case, be subjected to coercive process.

The contract purports to be the contract of the warden, but, assuming it to be valid, it is in truth the contract of the state; and the present action is in substance a suit against the state for specific performance. *Hapgood v. Southern,* 117 U. S. 52; *Ex parte Ayres,* 123 U. S. 443; *People v. Dulaney,* 96 Ill. 503; *Miller v. State Board of Agriculture,* 46 W. Va. 192; *Mills Publishing Co. v. Larrabee,* 78 Ia. 97; *Board of Public Works v. Gannt,* 76 Va. 455; 13 Ency. Pl. & Pr. 654. An action to enjoin state officers from doing acts which would constitute a breach of a contract with the state, and thus indirectly to compel specific performance was held, in *Ex parte Ayres, supra,* to be a suit against the state. And in *Hapgood v. Southern, supra,* it was decided that an action against state officers is an action against the state where the things required by the decree to be done are the very things which when done will constitute a performance of the state's contract. It was held in *People v. Dulaney, supra,* that the courts have no authority to compel by mandamus the performance of a business contract like the one here in question; and such seems to be the general rule. *Parrott v. City of Bridgeport,* 44 Conn. 180; *State v. Zanesville & Maysville Turnpike Road Co.,* 16 Ohio St. 308; *State v. Howard County,* 39 Mo. 375. But if the rule were otherwise, and if the contract were valid, the action could not be maintained. It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. *Davis v. Gray,* 83 U. S. 203; *United States v. Lee,* 106 U. S. 196; *Poindexter v. Greenhow,* 109 U. S. 63; *Cunningham v. Macon & B. R. Co.,* 109 U. S. 446; *Commonwealth v. Weller & Sons,* 82 Va. 721. A state may, of course, lay its sovereignty aside and consent to be sued on such terms and conditions as it may prescribe. This state has in a measure waived its prerogative. It consents to be sued in the cases mentioned in section 1106 of the code. "This section," says LAKE, J., in *State v. Stout,* 7 Neb. 89, "designates and includes all the various claims and demands on which the state may be sued and also the courts in which

28

actions thereon may be brought." The provision of the
constitution in relation to the bringing of suits against the
state (section 22, article 6) is not self-executing; legis-
lative action was necessary to make it available. *Chicago,
M. & St. P. R. Co. v. State,* 53 Wis. 509. The statute gives
no remedy against the state by mandamus or otherwise
in this court (*Ex parte Greene & Graham,* 29 Ala. 52);
and in no court does it give a right to sue upon the facts
disclosed by the present record. The state, like an individ-
ual or private corporation, may refuse to keep its engage-
ments; and the board of public lands and buildings, as a
governmental agency having plenary authority in all
matters pertaining to the control and management of the
penitentiary, is vested with power to determine whether
the state will perform or refuse to perform its contracts for
the leasing of convict labor. The action of the members of
the board in the matter is the action of the state; their
determination is its determination. The case of *State v.
Toole,* 26 Mont. 22, upon which counsel for relator seem
mainly to rely, is not pertinent. That was not an action for
specific performance, but to compel certain state officers
to discharge a duty specially enjoined upon them by
statute. In refusing to sign the contract in question
those officers did not do the will of the state. On the
contrary they refused to do what the state had in express
terms commanded them to do. The distinction between
that case and this is obvious.

The writ is denied.

WRIT DENIED.