SMITH *v.* NORTH LOUISIANA SANITARIUM.

Opinion delivered March 24, 1930.

*Marsh, McKay & Marlin,* for appellant.
*Mahony, Yocum & Saye,* for appellees.

BUTLER, J. This case involves the validity of a claim against the estate of T. L. Smith by the appellees, Doctors Abramson and Herold, for medical services, and by the appellee, North Louisiana Sanitarium, for hospital fees and services performed for a Mrs. L. R. Simmons. The probate court, and circuit court on appeal, allowed said claim in the sum demanded, and no complaint is made as to the items or amount of the claim, but the appellant, administrator of the estate of T. L. Smith, deceased, contends that the estate is not liable for services rendered Mrs. Simmons, first, as no competent evidence of any agreement on the part of T. L. Smith to be responsible therefor has been offered; second, that, if such undertaking was made by him, it is within the statute of frauds, being a collateral and not an original undertaking; and third, that in any event the estate is not liable for any services rendered to Mrs. Simmons by either the hospital or the physicians after the date of the death of T. L. Smith, December 17, 1926.

The testimony relevant to the issues involved, viewed in the light most favorable to the appellees, tends to establish the following facts: T. L. Smith and Mrs. Simmons were contemporaneously shot and wounded by the wife of T. L. Smith on or about the 4th day of December, 1926. Both were immediately taken to the appellee's sanitarium in Shreveport, Louisiana. The sanitarium is a corporation, of which Dr. Abramson is president. The wounded persons were there treated by the

appellees, Drs. Abramson and Herold, and cared for in the sanitarium until the death of Smith and the recovery of Mrs. Simmons. At the time of the arrival of Mrs. Simmons at the sanitarium the cause of the shooting appears to have been known and discussed by the officials of the sanitarium, and there was some question as to whether or not she should be permitted to remain in the institution. When Smith, who had already arrived, learned of this, he became greatly agitated and urged the sanitarium officials to care for her and the doctors to attend her, and assumed responsibility for her bills, agreeing to pay all her expenses, including hire of special nurse. Some days later Smith offered to sign a draft to take care of Mrs. Simmons' bills and hospital fees, nurses' hire, *et cetera*, but at that time he was so ill from the effect of his wounds the offer was not accepted, the doctors giving as a reason that they intended to wait until he could get better and then he might make the draft. The agreement of Smith relative to Mrs. Simmons was made with Dr. Abramson, chief officer of the institution, and with the superintendent of nurses and in the presence of some of the attendants; and from time to time Smith manifested great concern regarding Mrs. Simmons' condition, and reiterated his desire that she be given all the attention necessary. Smith gradually grew worse, suffering great pain, and died thirteen days after his entry into the hospital, and while still its inmate. Mrs. Simmons recovered, and was discharged in about ninety days from the date of her entrance into the sanitarium.

On a consideration of the case, the trial court concluded that there was sufficient competent testimony to establish the validity of the claim of the physicians and the sanitarium, and that the agreement of Smith was not a collateral oral promise to pay the debt of another, but was an original undertaking by which he secured the services of physicians for Mrs. Simmons, and the credit for this was extended to him and not to Mrs. Simmons, and that the estate was liable for services rendered Mrs.

Simmons after Smith's death. The evidence appears sufficient to support the court in its findings.

1. In considering the testimony relevant to the rights of the appellee sanitarium, it must be borne in mind that Abramson was not a party to the suit as to it, although suing for himself and his partner, Dr. Herold. The sanitarium is a corporation, and Dr. Abramson is its president. The testimony of the officers of the corporation would not be incompetent under § 4144 of Crawford & Moses' Digest, which provides: "* * * In actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transactions with or statements of the testator, intestate or ward, unless called to testify thereto by the opposite party. * * *" We have held that this statute applies only to those who are technically parties to the suit, and cannot be extended to parties interested in its result. *McRae* v. *Holcomb*, 46 Ark. 306; *Stanley* v. *Wilkerson*, 63 Ark. 556, 39 S. W. 1043. Nor does it include officers or agents of a corporation defendant. *Moseley* v. *Mohawk Lumber Co.*, 122 Ark. 227, 183 S. W. 187. Therefore, Dr. Abramson was a proper witness, in so far as the sanitarium was concerned, as to transactions had with the intestate. As to his own claims and that of Dr. Herold, his testimony was excluded by the trial court, but, as there were other competent witnesses testifying as to the agreement with respect to the employment of the physicians, there was legal testimony to support the finding of the court as to the validity of the claim of the doctors.

2. The evidence also warranted the conclusion that the oral agreement of Smith was the inducing cause for the care and treatment afforded Mrs. Simmons, and the credit was extended to Smith. In the case of *Grady* v. *Dierks Lumber & Coal Co.*, 149 Ark. 306, 232 S. W. 23, this court said: "* * * In the case of *Millsaps* v. *Nixon*, 102 Ark. 435, [144 S. W. 915], the court said, in determin-

ing whether an oral promise is original or collateral, the intention of the parties at the time it was made must be regarded, and in determining such intention the words of the promise, the situation of the parties, and all the circumstances attending the transaction should be taken into account, the purpose of the inquiry being to determine to whom the credit was originally given."

3. The last contention made is that, although the oral undertaking of Smith was properly established by competent evidence, original in its nature, and not within the statute of frauds, yet under the facts in this case, in whatever light they are viewed, the estate of T. L. Smith is not chargeable with any part of the account accruing after his death. This contention cannot be sustained, because the presumption must be indulged from the nature of the employment that it was to continue until the services were no longer needed. Therefore, the contract of employment and for services was for a definite period of time uncertain in its duration, but certain as to events which would determine its ending, namely, the death or recovery of the patient, and from the nature of the case that these determinative events would occur within a time which might reasonably be anticipated. The need of the patient, and not the demise of the employer, must be the factor in the determination of the time in which the contract should cease. This principle was announced in the case of *Dale & Banks* v. *Donaldson Lbr. Co. and Putnam*, 48 Ark. 188, where it was said: "If he (physician or surgeon) is called to attend in the usual manner, and undertakes to do so by word or act, nothing being said or done to modify this undertaking, it is quite clear as a legal proposition that not only reasonable care and skill should be exercised, but also continued attention as long as the condition of the patient might require it, in the exercise of an honest and properly educated judgment." This principle is also laid down and approved in the case of *Toland* v. *Stevenson*, 59 Ind. 485, and *White's Executors* v. *The Commonwealth*, 39 Pac. St. 167.

Counsel for the appellant endeavors to distinguish these cases from the case at bar in this, they stress upon our attention the moral obligation resting upon the intestate in his lifetime, in the case quoted, to provide for the wants of his family, and insist that such was sufficient to make the employment a continuing one, and urge the lack of such obligation in the instant case. On this point we take issue with able counsel for the appellant. By his own unsocial conduct, Smith created a situation which brought to pass the tragedy resulting in his own death, and the serious and painful wounding of Mrs. Simmons, and her open shame. The wronged and revengeful wife of Smith was the one who inflicted upon Smith and Mrs. Simmons the wounds from which they suffered. It is common knowledge, that it is the woman, often more sinned against than sinning, who must bear the weight of society's disfavor in cases such as this. This Smith, desperately wounded as he was, fully realized, and, sensible that it was his own lawless passion which had plunged the frail and yielding partner of guilt in so great a depth of pain and woe, and, seeing her about to be denied the ministrations which it would have been inhuman to refuse even a wounded beast, felt moved by every sense of honor and loyalty in the behalf of the partner of his guilt to secure for her the relief and care she so much needed. The writer thinks a strong moral obligation rested on Smith; he was in honor bound to do no less.

Since the contract in this case was for a definite time, and for services to be rendered another, and since it was within the contemplation of the parties that the services should be rendered as long as needed and regardless of the death of the employer, the position of appellee is further supported by the authority of the case of *Barrett* v. *Towne,* 13 L. R. A. (N. S.) 643, where it was held that in the employment of an attorney to defend the brother of the client in a criminal prosecution, that "the best possible defense should be made" and

"from the beginning to the end," such employment was not terminated by the death of the client, and the attorney could recover for services thereafter rendered. In that case the court said: "Undoubtedly, at common law, when not coupled with an interest, the death of the principal revokes the authority of the agent. The agency ceases, because the power to act is dependent upon the control and direction of another, which has been withdrawn by death. (Citing cases). If the plaintiffs had died, it may have been terminated, for performance by them depended entirely upon their personal efforts. (Citing cases). But, as no act was required to be done, either by the testator himself, or in his name, a complete performance was possible without any direction or intervention on his part. If, at his own expense, he had procured the attendance of a physician to treat his brother until cured of a physical ailment, or had contracted with a grocer to furnish him provisions for a year, there would be great difficulty in saying that in either instance his death during performance ended all further liability, because his estate was not bound. Manifestly such a construction instantly would defeat the very object for the accomplishment of which he purposely had obligated himself. In principle the present case must be treated as parallel with the illustration. The various services were neither to be performed, nor was the case to be conducted, in his behalf. * . * * The employment of the plaintiffs was coextensive with the subject-matter with which the parties dealt, and they were not only engaged to assist in its preparation, but to make 'the best defense' of the brother's case. * * * No express limitation of time within which these services should be performed, or the required disbursements made, was named. Very plainly, the plaintiffs rightly understood that the testator contemplated and intended that the period of performance should be measured solely by the time which ordinarily would be requisite in the orderly progress of litigation of this class and magni-

tude. ('Citing cases). The general rule is settled, that, where express words of limitation to the contrary are not found, the presumption is that the promisor intends to bind his personal representatives. (Citing cases). The intention of the parties furnishes the true criterion, which must be gathered from the language they employ, while each case as it arises must be largely decided upon its particular facts. It was his unqualified purpose to procure an acquittal of his brother through the means of a full preparation of the defense, and the professional efforts of competent counsel, by becoming pecuniarily responsible, as he certainly did, to pay all expenses. But his undertaking went no further. He did not intend to assume the power of control, either by himself, or by a substitute, over the proceedings at any stage. The alleged conspirators, while thus receiving the benefit of his aid, were left absolutely free to conduct their own case from beginning to end as they deemed best, and the requirements of appropriate legal procedure demanded. If thus construed, each contract remained in force, while this condition of affairs compelled the active continuance of the services of the respective plaintiffs. It therefore survived the death of the testator, and his executors became bound to its performance.''

We can see no valid distinction in principle in the case last cited from the instant case, and those cases cited, *supra,* and relied upon by the appellant are readily distinguishable from the case at bar, and the cases of *Toland* v. *Stevenson* and *Barrett* v. *Towne, supra.* The agreement did not create the relation of principal and agent between the parties, for there was no supervisory control on the one part or dealing with the subject-matter of the agreement in a representative capacity on the other part. Neither would appellant's intestate have been liable to Mrs. Simmons for any neglect or malpractice on the part of either of the appellees. Therefore, the undertaking was not a contract of agency, but of employment for a particular purpose, the method of the

services rendered discretionary with the employed, and over which the employer neither expected to, nor could have, any control; and, as the contract was not for services indeterminate in their nature, and indefinite in their duration, the cases cited by the appellant have no application. *Campbell* v. *Faxon,* 73 Kan. 675, 85 Pac. 760, 5 L. R. A. (N. S.) 1002; *Lacey* v. *Gateman,* 119 N. Y. 109, 6 L. R. A. 728; *Babcock* v. *Goodrich,* 3 How. Pr. N. S. 52; *Howman* v. *Redick,* L. R. A. 1915C, 601; *Mendenhall* v. *Davis,* 21 L. R. A. (N. S.) 914.

From the conclusions reached, it follows that the findings and judgment of the trial court must be affirmed, and it is so ordered.