EVA IRENE GRIMES, APPELLEE, V. J. L. BAKER, APPELLANT.

275 N. W. 860

FILED NOVEMBER 12, 1937. No. 30000.

*Gaines, McLaughlin & Gaines,* for appellant.

*Clarence T. Spier* and *Arthur C. Bailey, contra.*

Heard before GOSS, C. J., ROSE, DAY, PAINE, CARTER and MESSMORE, JJ., and KROGER, District Judge.

PAINE, J.

This is an action by a stockholder to compel another stockholder, who had recommended the investment, to carry out a promise to save her from loss in the event the stock went down.

The first opinion of this court appears in 132 Neb. 898,

273 N. W. 789, in which a statement of the principal allegations of the pleadings and a discussion of some of the Nebraska cases in relation thereto are briefly set out.

The brief in support of a rehearing by plaintiff and appellee charged that the former decision was not supported by any evidence, but was based upon a misconception of the facts, and that it was contrary to former decisions of this court. A reargument was therefore allowed upon the motion for a rehearing, and in this decision an attempt will be made to clarify the former opinion as to some of the points discussed by plaintiff in such reargument.

If the former opinion implied in any way that the defendant took the witness-stand and testified, it would be an error, for Robert S. Morse, his private secretary, testified that he saw the defendant daily and looked after his affairs, and that defendant was 81 years old, and his mental condition was very bad, and that in his opinion he would not be a competent witness to testify to business matters.

Plaintiff charges that the former opinion stated that the defendant represented to the plaintiff's mother, while he was lunching with her at the Omaha Athletic Club, that he had received not only regular dividends, but stock dividends, in the company in which she was urged to buy stock. An examination of the evidence shows that he made the statement referred to upon the earnings of his stock in the United States Gypsum Company, and that he said he thought there was just as big an opportunity for making money in the new Universal Gypsum & Lime Company, in which he was buying stock, as there had been in the United States Gypsum Company, and told why.

Plaintiff also attacks the statement made in our former opinion as to the ownership of the stock sold to her, and insists that it is quite obvious that the defendant was selling his own stock to the plaintiff. We have been absolutely unable to find any statement in the record which in any way supports this claim. In exhibit No. 4, a letter from defendant, J. L. Baker, written on the Baker Ice

Machine Company's stationery, of which company he was president, to the mother of the plaintiff, with whom all negotiations were had, he said that he noted that the plaintiff was willing to pay $17 a share for the stock, but he had been holding off, hoping to get it for her at a lower price, and that he had finally succeeded in doing so, and that he had sent the same to Chicago to have it transferred to her, and was glad to save her $2 a share on the buy.

In a letter from the defendant, dated November 12, 1926, being exhibit No. 5, and written to the mother of the plaintiff, he refers to the purchase of some of the 7 per cent. preferred stock, and says he has been buying this stock himself all the way down from $70 a share to $64 a share, and put her stock in at $64 a share, and "think she has a profit in it today of $11 a share," and that the 12 shares amount to $768, the amount of her check, which was dated August 20, 1926, and which he says he has not cashed until that day. He also says in this letter: "I had an order in for myself for 100 shares of this stock, but could only get a part of it at this figure, and could not buy it for less than $75 today." This letter, exhibit No. 5, was forwarded to the plaintiff, with a postscript at the bottom, signed, "Affectionately yours, Mamma," and one paragraph of the postscript reads: "Mighty fine of Mr. Baker to put yours in at the lowest price of the stock he secured."

In the plan of reorganization, being exhibit No. 17, it shows in the balance sheet of April 30, 1935, that the amount of preferred stock outstanding, of a par value of $60 a share, was $1,057,680, together with common stock outstanding of $455,549.

Exhibit No. 26 was a registered letter, mailed by defendant September 7, 1926, to the company at its office in the Conway building, Chicago, inclosing 25 shares of stock in the name of George E. Sipple, and 25 shares of stock in the name of Henry Sipple, which certificates he desired them to transfer to the plaintiff, and mail to her mother at Fremont.

In exhibit No. 25, dated September 9, 1926, the company

by its secretary acknowledges receipt of the registered letter of September 7, and writes that they are forwarding the 50 shares to plaintiff, as directed, and are inclosing to him certificate No. 4332 for 350 shares issued to him.

Exhibit No. 9, offered by the defendant and received without objection and read to the jury, was an informal letter written by plaintiff's mother with a pen to Mr. Baker, and began, "Dear Link," and contains this paragraph: "I am sorry if I did not make myself clear about the Gypsum stock. I told Eva Irene about it and she wanted 100 shares and gave the money for it. I understood you that you had 50 shares and I sent the money for that amount. I should have sent the full amount that Eva Irene gave me in the first place but only sent enough for what I understood you to say you had and wanted you to get 50 more for her. If it is too late to get it at the price paid for mine I will pay the difference and promise not to bother you any more with business affairs for me." This letter is signed, "Eva."

We have endeavored, by going into detail, to clear up some of the criticisms made in the brief and argument for rehearing as to the statements of fact in our former opinion, and the court fails to see anything in the evidence which even remotely tends to support the statement made repeatedly by the plaintiff that the stock sold to her was stock which belonged to the defendant himself.

On the other hand, a more careful examination of the bill of exceptions convinces the court that the stock purchased by her mother's request was purchased on the open market, at the same time the defendant was purchasing a very large amount of the same stock in several different lots, and that he purchased for her the few shares of stock she wanted at the lowest price obtainable at the time at which he was purchasing a much greater amount of stock for himself at much higher prices.

It is insisted finally by the plaintiff that the former decision in the case at bar is contrary to the law of Nebraska, as previously announced by this court in *Trenholm*

*v. Kloepper,* 88 Neb. 236, 129 N. W. 436, in which it was said: "If an officer of a corporation orally promises a prospective purchaser of the corporate stock to repay the purchase price at any time and the purchaser acts upon the promise, the agreement is an original contract, and is not within the statute of frauds."

Before setting aside such former holding, we decided to make a careful reexamination of the record in that case, and find the following state of facts:

Belle S. Trenholm, the plaintiff in that case, was a widow who secured certain money from life insurance upon the death of her husband. The defendant, who had been well acquainted with her for many years, and whose place of business adjoined her husband's place of business, called at her home twice within a period of ten days, urging her to buy stock in the Lincoln Transfer Company, of which he was the president and active operating manager, there being a bookkeeper also in the office. He represented to her that the stock never paid less than 15 per cent., and had paid as high as 21 per cent., and was a good investment for her funds.

The evidence disclosed that the authorized capital stock of this transfer company was at that time $25,000, and it is not disclosed how much of it was unsold and in the treasury of the company, but the defendant owned at least $5,500 of the capital stock.

He went with her to her box in the safety deposit vault, and she handed him $1,100 in currency for the stock. Plaintiff claims that he promised her that, at any time she notified him and gave him three or four months' notice, he would take the stock off her hands. When later on she asked him to repay her money, he said it would be hard for him to write a check just then, for he had promised to pay Albert Urban for his stock, and therefore he did not have the money to pay her just then. Her stock was issued to her on December 28, 1904, by the defendant, who signed the same as president, and the certificate was signed by G. W. Berge as secretary.

T. J. Doyle, attorney, testified that he presented the plaintiff's certificate of stock to the defendant and demanded repayment of him of $1,100, and the defendant said that he had had a contract with G. W. Berge, attorney and secretary for the company, to take up his stock of either $2,000 or $2,500, and he had taken that up. Mr. Doyle testified that the defendant also had added that such agreement with Mr. Berge had been in writing, and he refused to take up plaintiff's stock.

The defendant testified that he had been president of the company for about 15 years; that the stock sold to Mrs. Trenholm was treasury stock, issued by the company, and not owned by the defendant. The defendant admitted he told her that it was a good investment, and that it was selling at a premium of 10 per cent., or $1,100 for ten shares, but did not recall that he told her that he would take it back upon demand.

The syllabus in the case just discussed should, to meet the record therein, have read:

If the managing officer of a corporation, who is the principal stockholder therein, orally promises a prospective purchaser of its treasury stock that he will, upon notice, take it off her hands if she is dissatisfied with her purchase, the agreement is an original contract, and is not within the statute of frauds.

In the case at bar, the defendant had no personal interest in whether the plaintiff purchased the stock or not. It did not mean a penny to him. Plaintiff had a small amount of money to invest. Her mother testified she considered Mr. Baker an exceptional financier, and she had had other deals with him, as shown by her letter of October 6, 1932, written after she had become Mrs. Ross L. Hammond, being exhibit No. 24, the last paragraph of which letter reads: "When you very kindly loaned me $1,500 to margin my General Motors I expected to pay you back in full very soon. Conditions have developed in an unprecedented condition since and people have not paid their obligations to me; so I have been able so far to pay

only a small part of the principal. But Link as I lost through your recommendation to purchase Uni. Jypsum I think you should be very lenient in regard to the payment of the note or send it to me canceled."

In our opinion, in all the decisions which have allowed a recovery on a rescission of a sale of stock, it will be found that in the sale to the plaintiff there was a good consideration for the option to repurchase given by the seller; that such a contract is regarded in the nature of one of indemnity, and not within the statute of frauds.

In our former opinion in the case at bar, we wrote but one syllabus, which reads: "An agreement without consideration is *nudum pactum* and unenforceable."

The law has held from the earliest times that "a contract naked of any obligation or duty on one side—a *nudum pactum*—is not enforceable." *Virtue v. Stanley,* 87 Wash. 167, 151 Pac. 270.

*Nudum pactum* is "a voluntary promise, without any other consideration than mere good-will, or natural affection." *Justice v. Lang,* 42 N. Y. 493, 1 Am. Rep. 576.

It was said by the Kentucky bench in 1819: "This would be against conscience, and in violation of a favorite maxim in both courts, that there must be, in every contract, to render it valid, a good, or a valuable consideration. The *'quid pro quo'* is the delight of the law; so much so, that out of the various considerations which influence human action, it has selected and considered the two foregoing only—the good and the valuable." *Shackelford v. Handley's Executors,* 1 A. K. Marsh. (Ky.) *496, 10 Am. Dec. 753.

In 1 Restatement, Contracts, 80, sec. 75, appears this very pertinent comment: "No duty is generally imposed on one who makes an informal promise unless the promise is supported by sufficient consideration."

"Reciprocal promises as the basis of a valid agreement must be equally obligatory upon the parties, so that each may have an action thereon; otherwise such agreement is *nudum pactum.*" *State v. Holcomb,* 46 Neb. 612, 65 N. W. 873.

We are still of the opinion that there was no consideration binding the defendant.

JUDGMENT REVERSED AND CAUSE DISMISSED.

CARTER, J., concurs in the result.

DAY, J., dissents.