IN THE MATTER OF THE ESTATE OF CHAUNCEY H. ALLEN, JANE STEEN ALLEN, APPELLEE, V. DONALD E. ALLEN, EXECUTOR, APPELLANT.

25 N. W. 2d 757

FILED JANUARY 10, 1947. No. 32097.

*F. J. Reed,* for appellant.

*Neighbors & Danielson,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

YEAGER, J.

This is an appeal from the allowance of a claim in favor of appellee and claimant against the estate of Chauncey H.

Allen, deceased, based upon an alleged verbal promise of the said deceased to pay $25 per month or see that that amount was paid if appellee would consent to the entry of an allowance and award of $25 per month for the support and maintenance of minor children of appellee and Amos C. Allen in an action in the district court for Lincoln County, Nebraska, wherein appellee had obtained a divorce from Amos C. Allen. In the district court the claim was allowed and judgment rendered in favor of appellee. From this judgment the executor of the estate of Chauncey H. Allen has appealed.

It is disclosed by the record that on or about July 3, 1929, Jane Steen Allen and Amos C. Allen, a son of Chauncey H. Allen, were married. They were divorced in 1935 or 1936 and remarried on May 22, 1939. Appellee procured a second divorce from Amos C. Allen in the district court for Lincoln County, Nebraska, July 2, 1940. Three children were born of the first marriage. In the decree no alimony was awarded and no allowance made for the support of the children.

By written stipulation dated March 24, 1942, appellee and Amos C. Allen agreed that a judgment might be entered in the divorce action against Amos C. Allen for the support and maintenance for $25 per month beginning April 1, 1942, until the further order of court. An order was entered in conformity with the stipulation, which was filed on March 27, 1942.

Chauncey H. Allen died in March 1945. As already pointed out the action is against his estate.

The action was commenced by the filing of a claim in the county court of Scotts Bluff County, Nebraska, by the appellee herein. The claim recited the details already herein set forth as to the marriages and divorces of appellee and Amos. C. Allen, the facts as to minor children, the stipulation for entry of award for support and maintenance of minor children, the entry of allowance and judgment, and charged that Amos C. Allen had failed to make payment of

any installments except the first of $25 and that all other installments were due and unpaid.

Appellee alleged that all of the due and unpaid installments and installments to become due were a charge against the estate of Chauncey H. Allen, deceased. Her pleaded contention in this respect was the following: "That prior to entering into said stipulation and prior to the entry by the court of the award of support money as aforesaid and as an inducement for this claimant to agree to accept said sum for the support of said children, the deceased, Chauncey H. Allen, promised, promised and agreed with this claimant that he would personally pay or see that said installments were paid and represented that it would be an advantage to this claimant to accept a smaller amount than the court might award in case the matter was contested and be certain of obtaining the amount of twenty-five dollars ($25.00) a month."

To the claim objections were filed. The objections are five in number but for the purposes of this opinion it only becomes necessary to say that in them was contained a general denial and an allegation that the claim is void and unenforceable against the estate.

A trial was had in the county court which resulted in a denial of the claim. From the judgment of the county court an appeal was taken to the district court. The case was tried in the district court on the same pleadings as in the county court.

In the district court the case was tried to a jury. At the conclusion of appellee's case the executor moved for a directed verdict which was overruled. At the conclusion of all of the evidence the appellee moved that the court discharge the jury and that a judgment be rendered in her favor or in the alternative that the jury be directed to return a verdict in her favor for all amounts claimed to be due. Thereupon the executor moved for a dismissal of the action or in the alternative that a verdict be directed in his favor. On this joinder of motions for directed verdict the

court properly discharged the jury and proceeded to a determination upon the issues presented.

"Where both parties at the close of all the evidence, without reservation, move for a directed verdict, each invites the court to discharge the jury, determine the facts, and apply the law thereto." Fidelity & Deposit Co. v. B. Grunwald, Inc., 129 Neb. 749, 262 N. W. 831.

The district court determined the issues in favor of appellee herein and rendered judgment in her favor and against the estate for $1,156.93, and the executor was ordered and directed to retain sufficient funds to pay future monthly installments of $25 each beginning February 1, 1946, and ending when the youngest child shall become of age or self-supporting or the dependency for some other reason of all of the said minor children shall cease, whichever event occurs first, or until there has been such a change of conditions of the parties as would warrant a court of competent jurisdiction to relieve the estate of further future payments and until such order has been rendered and become final.

A motion for new trial was filed and overruled. It is from this judgment and the order overruling the motion for new trial that the executor has appealed.

In the executor's brief are found nine assignments of error. Only a part of them require discussion. The first to be considered herein is one wherein it is contended that the court erred in entering a judgment in favor of the claimant which is wholly unsupported by the evidence.

As has been pointed out by quotation from the claim the action is predicated on an allegation that claimant was induced to agree to accept $25 per month under an order which was to be entered against Amos C. Allen in the divorce case by the promise of deceased that he would personally pay the installments or see that they were paid.

Although apparently the trial court decided the case on the assumption that there was an agreement entered into between deceased and appellee with respect to accept-

ance of $25 per month for child support yet an examination of the bill of exceptions contains no evidence to support the assumption. The only evidence relating to any kind or character of agreement by Chauncey H. Allen to support or contribute to the support of the minor children of appellee and Amos C. Allen is found in the testimony of Dr. C. J. Steen, father of the appellee. There is no word therein to indicate that Chauncey H. Allen made any offer to contribute to the support of the minor children with reference to a stipulation signed or to be signed, or any hearing, or any proposed order to be entered in the district court for Lincoln County, Nebraska, or anywhere else. Furthermore, there is no direct evidence or evidence from which a legal inference could be drawn that Chauncey H. Allen ever at any time knew of any proposed stipulation or order, or the existence of either after they were respectively signed and entered. The evidence bearing on this subject is the following and it will be observed that nowhere in it is found any reference to a stipulation or other proposed agreement, or any kind or character of court order: "Q—Will you state as nearly as you can, Doctor, what he said, what you said and what Jane said—give us the conversation? A— Jane told him that she should have some support for the children, and he agreed with her, and she was asking for more money—in fact, she wanted $75.00 a month, $25.00 for each one of the children. * * * Q—Don't say what she was wanting, but say what was said, Doctor. A—All right. Mr. Allen said he would be responsible for the payment of $25.00 each month to her for the support of the children. Q—Did he say anything about the $75.00? * * * A—His only mention of the $75.00 was that it was in excess of what he could affort to pay. * * * Q—Did he say anything about why he wanted this support money reduced or anything concerning that? * * * A—No, he did not. Q—After discussing it, what did he finally say he would do? * * * A—He said that Jane could depend upon the receipt of so much—$25.00—each month. * * * Q—Did Mr. Chauncey

Allen make any statement as to why he thought Jane should reduce her demand to $25.00 per month? * * * A—Yes. He felt that if she would reduce it she would be sure to receive the amount that was agreed upon. * * * Q—Well, did he make any explanation of that in your presence? * * * A—Mr. Allen stated several times he felt an interest and a love for the children; he expressed the knowledge that he did have a duty and an obligation there. * * * A—He said that he did have an interest and love for his grandchildren, and he intended to see that they were partially provided for. * * * Q—I will ask you, doctor, if you were asked the question, 'What did he say about that?' * * * Q—And if you didn't answer—that is on Page 15—'He would be willing to make a contribution each month for the support of the children, and he stated, also, that he figured $25.00 would be a fair figure in this contribution and he would assume the responsibility for this contribution. No time was mentioned as to the limit, however.'? A—Yes, I did make that answer. * * * Q—And was that answer true, doctor? A—Yes. Q—I will ask you if you didn't also testify in connection with this examination Mr. Reed has asked you about— — — * * * Q—'Was there anything else said that you remember about this support money and what he was going to do — — what Chauncey Allen was going to do, if anything?' And did you not answer, 'He was going to see that it would be paid regularly:'? A—Yes, I made that reply. Q—Is that true? A—That's true."

Therefore there having been no evidence in proof of the existence of the agreement relied on as a basis for recovery it would appear that the trial court erred in allowing the claim in favor of the appellee.

Assuming however, as the trial court did, that there was evidence of the agreement contended for by appellee in her pleadings, still that would not make the judgment rendered properly available to her. The judgment would not be properly available to her since the agreement, if made, was unenforceable for the reason that it was one inhibited by section

36-202, R. S. 1943, which is one of the sections of what is commonly referred to as the statute of frauds. The pertinent part of the section is the following: "In the following cases every agreement shall be void, unless such agreement, or some note or memorandum thereof, be in writing and subscribed by the party to be charged therewith: (1) Every agreement that, by its terms, is not to be performed within one year from the making thereof; (2) every special promise to answer for the debt, default, or misdoings of another person; * * *."

It will be noted that the pleaded agreement was not in writing. The pleaded promise, if made, was to answer for the debt or default of Amos C. Allen.

This statutory provision has been considered on numerous occasions by this court and its meaning has not been extended or expanded by interpretation. Recent cases are Grimes v. Baker, 133 Neb. 517, 275 N. W. 860; Johnson v. Anderson, 140 Neb. 78, 299 N. W. 343.

The appellee contends that the promise here is without the statute of frauds and is not controlled by it. With this contention we cannot agree.

The case of Johnson v. Anderson, *supra,* contains a statement of the essentials necessary to take an oral promise to answer for the debt or default of another out of the inhibition of the statute of frauds. In the opinion it was said in interpretation and application of this statutory provision: "In the present case the oral promise as claimed was, in effect, to pay a primary debt of another antecedently contracted, and no new consideration moved to the promisor. Under these circumstances, 'It is said that a consideration to support a promise, not in writing, to pay the debt of another must be of a peculiar character, and must operate to the advantage of the promisor, and place him under a pecuniary obligation to the promisee independent of the original debt, which obligation is to be discharged by the payment of that debt.' " The inside quotation, which is approved, is from 25 R. C. L., § 79, p. 495.

In applying the test of that pronouncement to the case at bar it becomes clear that the alleged agreement comes within the inhibition of the statute of frauds.

The promise was to pay the debt of another and there was no new consideration, in truth, there was no consideration at all flowing to the deceased, unless it may be said, as appellee substantially contends, that the promise to pay was in lieu of an obligation imposed upon him by statute to support pauper grandchildren out of which advantage flowed to the deceased.

The two sections of the statute to which reference is made are the following:

"Every poor person, who shall be unable to earn a livelihood in consequence of an unavoidable cause, shall be supported by the father, grandfather, mother, grandmother, children, grandchildren, brothers or sisters of such poor person if they or either of them be of sufficient ability. Every person who shall refuse to support his or her father, grandfather, mother, grandmother, child or grandchild, sister or brother, when directed by the county board of the county where such poor person shall have a legal settlement, whether such relative shall reside in the same county or not, shall forfeit and pay to such county board, for the use of the poor of the county rendering care, such sum as may be by such county board adjudged adequate and proper to be paid, not exceeding ten dollars per week for each and every week for which they or either of them shall fail or refuse, to be recovered in the name of such county board, for the use of the poor aforesaid, before a justice of the peace or any other court having jurisdiction; *Provided,* whenever any persons become poor persons from intemperance or any other bad conduct, they shall not be entitled to support from any relative except parent or child. Such poor person entitled to support from any such relative may bring an action against such relative for support in his or her own name and behalf." § 68-101, R. S. 1943.

"The children shall first be called upon to support parents, if there be children of sufficient ability; and if there be none of sufficient ability, the parents of such person shall next be called upon; and if there be no parents nor children, the brothers and sisters shall be next called upon; and if there be no brothers nor sisters, the grandchildren of such poor person shall be next called upon, and then the grandparents; *Provided,* married females, while they live with their husbands, shall not be liable to a suit for maintenance beyond the interest or income of the estate of such married female held in her own right." § 68-102, R. S. 1943.

It will be observed that in these sections provision is made whereby a grandparent may become obligated to support his or her pauper grandchildren. It cannot be said though that the statute itself fixes the liability. In Howard County v. Enevoldsen, 118 Neb. 222, 224 N. W. 280, regarding the conditions for fixation of liability pursuant to the terms of the statute, this court said: "The right of the plaintiffs to recover against the defendant is purely statutory, and to recover against him they must have established their right under the provisions of section 5140, Comp. St. 1922 (now section 68-101, R. S. 1943), which provides:

"Under that statute, before a recovery could be had the plaintiffs were required to prove that Fredricka Petersen was a poor person unable to earn a livelihood in consequence of some bodily infirmity, idiocy, lunacy or other unavoidable cause."

There is no evidence of fixation or attempted fixation of liability under these statutory provisions. We fail therefore to see how they can have any bearing on the matter of consideration for the alleged agreement which is the subject of this action.

This being true the agreement sued on, if there was such an agreement, was nudum pactum, it being without consideration. It is well settled by the decisions of this

court that an agreement without consideration is nudum pactum and is unenforceable.

If it be assumed that a theory on which this case was presented was that an original oral agreement, different from the one pleaded, was entered into between deceased and appellee whereby deceased undertook to pay or see that $25 per month was paid for the support of the children involved, such an agreement would be unenforceable for the reason that it was without consideration and nudum pactum for the same reason and on the same basis as the pleaded agreement was so declared. It is not contended that there was or could be any other or different consideration for such an original oral agreement than for the one described in the pleadings.

The appellee therefore having failed to prove the existence of an oral agreement within the purview of her pleadings or the issues presented to the court the trial court erred in the first instance in refusing to sustain the motion of the executor made at the close of appellee's case to direct a verdict in favor of the said executor. At the close of the evidence the court erred in refusing to direct a verdict in favor of the executor and render judgment in his favor.

The judgment of the district court is reversed with directions to the district court to dismiss the action.

REVERSED WITH DIRECTIONS.

SIMMONS, C. J., and WENKE, J., concur in the result.

PAINE, J., dissenting.

In my opinion, the judgment entered by the district court was right, and should have been affirmed by this court.

The record in this case discloses that Jane Allen, the claimant, married Amos C. Allen, a son of Chauncey H. Allen, deceased, July 3, 1929, at Lusk, Wyoming, and three sons, Roger, born August 29, 1930, Robert, born September 8, 1932, and James, born June 22, 1935, were the issue of this union. Claimant obtained her first divorce in January

1936, and the parties were remarried May 22, 1939, after which Amos Allen supported his family for three or four months and deserted them finally in August or September 1939.

Jane Allen testified that Amos Allen, her husband, drank excessively and that he "was sentenced to the penitentiary" for "writing checks on his father." The evidence shows that during some of this time Chauncey Allen paid $15 a month rent for them; that when she was not working her father, Dr. Steen, supported her and the boys.

Jane Allen obtained a final decree of divorce in Lincoln County, where she was working as a clerk in the Census Bureau. The decree was dated July 2, 1940, which granted her the care, custody, and control of the three children, but granted her no alimony, and further provided "that the matter of the amount which the defendant shall be required to (pay) the plaintiff for the support and maintenance of said minor children shall not be determined at this time, but is expressly reserved until further order of this court," and taxed the costs to the plaintiff.

On January 29, 1941, Amos Allen married his second wife, Marion Hartz, at Chadron, Nebraska. On January 7, 1942, Jane Allen filed an application in the divorce action, setting out that the three boys were in school and needed suitable clothing and food, and that their father, Amos Allen, had willfully failed, neglected, and refused to pay or contribute any sum whatever for their support, and prayed that the court make an order directing defendant to pay a reasonable sum each month toward their support, maintenance, and education.

In the latter part of March 1942, Chauncey Allen, the deceased, called Jane Allen, his daughter-in-law, by telephone and asked her to come up to Mitchell and talk matters over with him. She had no car, and asked her father, Dr. C. S. Steen, a dentist at Scottsbluff, to drive her to Mitchell, which he did, and they took Jimmy, the youngest grand-

son, along with them. They stayed about an hour and a half, and Dr. Steen testified as follows:

"Q—In a general way, can you tell what that conversation was—how the conversation came up, what was said between Chauncey Allen and Jane Allen on that subject? A—Well, we were visiting on different subjects and topics and, oh, consuming, oh, perhaps a half-hour or so, and Jane asked Mr. Allen what he thought about helping her with her children, and he told her—he said that he would be willing to help her, and while he felt that she wasn't getting enough, he figured that she should be satisfied with getting a sure amount every month rather than depending on a greater amount and not being sure of it. * * * Mr. Allen said he would be responsible for the payment of $25.00 each month to her for the support of the children. Q—Did he say anything about the $75.00? * * * A—His only mention of the $75.00 was that it was in excess of what he could affort to pay. * * * Q—Did Mr. Chauncey Allen make any statement as to why he thought Jane should reduce her demand to $25.00 per month? * * * A—Yes. He felt that if she would reduce it she would be sure to receive the amount that was agreed upon. * * * Q—Well, did he make any explanation of that in your presence? * * * A—He said that he did have an interest and love for his grandchildren, and he intended to see that they were partially provided for."

On cross-examination Dr. Steen was asked if he did not testify in the county court on the hearing of the claim, about October 12, 1945. "Q—And if you didn't answer— that is on Page 15—'He would be willing to make a contribution each month for the support of the children, and he stated, also, that he figured $25.00 would be a fair figure in this contribution and he would assume the responsibility for this contribution. No time was mentioned as to the limit, however.'? A—Yes, I did make that answer."

It is clear from this evidence, therefore, that at that time this grandfather decided that $25 would be a fair

figure for him to pay for the support of his three grandsons; he then promised their mother that he would assume the responsibility of making a monthly contribution to her in that amount.

It should be kept in mind that this promise by Chauncey Allen was made to his daughter-in-law at a time when no decree for any support money had yet been entered in the divorce case at North Platte against Amos, and it was also before the mother had signed any stipulation in regard thereto.

Nothing in the conversation or agreement made between the parties that night referred in any way to a promise by the father to answer for the debt or default of Amos. It was an original undertaking on his part, and is not governed by the statute of frauds.

In the case of Bader v. Hiscox, 188 Iowa 986, 174 N. W. 565, we find these words: "The further suggestion by appellee, that the alleged promise of the defendant is within the statute of frauds, as being an engagement or promise to answer for the debt, default, or miscarriage of another, is not sound. The defendant did not undertake to answer for the debt or default of his son. The promise, if made at all, was his own individual undertaking, and this is none the less true because his son enjoyed the benefit, in whole or in part, of the performance of the agreement on part of the plaintiff."

Very shortly after this agreement was made between Chauncey Allen and Jane Allen, Chauncey Allen's attorney, Frank Reed, prepared a stipulation, to file in the divorce case, for support money of $25 a month, which stipulation is exhibit No. 5. The attorney also prepared a receipt, being exhibit No. 3, and dated April 1, 1942, in which Jane Allen acknowledges receipt of $25.

The claimant stated in her amended claim "That the claimant relied upon statements and agreements with Chauncey H. Allen, aforesaid, and was induced by his said statements to enter into the stipulation aforesaid and to

accept an award of the court of twenty-five dollars ($25.00) a month for the support of said minor children."

Jane Allen testified that she frequently called Chauncey Allen after his agreement, asking him for money, and exhibit No. 6 consists of six checks which he sent her, the first dated May 13, 1942, and the last dated December 16, 1942, the total amount being $90. Chauncey Allen died at Mitchell, Nebraska, on March 30, 1945, and Jane Allen filed this claim against his estate to collect the balance due on the payments he promised her he would make for the support of his three grandchildren.

The executor in his brief charges, although the evidence does not support the charge, that it is an oral agreement to answer for the debt of another, and is a verbal contract not to be performed within one year, and unenforceable under the statute of frauds. See § 36-202, R. S. 1943.

This dissent is based on the theory that the record sustains an affirmance of this case on the ground that the claim of the plaintiff is on an entirely independent contract, promise, and agreement of the grandfather to pay $25 a month for the support of his three grandsons, which was a very natural thing for him to do, as it was well known by both parties to this contract that Amos, the father, would never willingly pay a cent toward the support of his boys. Should this meritorious claim be dismissed?

However, the opinion adopted in this case is based on a very strict adherence to the ancient provisions of the statute of frauds, which many authorities now believe has entirely outlived its usefulness—if it ever had any.

It may, therefore, not be out of place to discuss briefly the history of the adoption of the original statute of frauds in England. We find at once that as originally enacted it contained 25 sections, but only the 4th and the 23d sections still survive in England. The original 4th section is the forerunner of our Nebraska provision.

In any examination it is disclosed that there is grave doubt about its authorship. 37 C. J. S., Statute of Frauds, § 1, p. 513. Lord Nottingham said the statute of frauds had its first rise from him. Lord Ellenborough said it was drawn by Sir Matthew Hale, but he had died the previous Christmas. A civilian judge, Sir Leoline Jenkins, also known as Sir Lionel Jenkins, doubtless had much to do with the framing of the statute.

The records disclose that the English statute of frauds was passed at the session of Parliament beginning February 15, 1676, and received royal assent on April 16, 1677, and went into effect June 24, 1677. See Reed, Law of Statute of Frauds, § 1, p. 2; 14 Ill. Law Review, p. 3; 26 Harvard Law Review, p. 329.

Lord Mansfield declared the statute was not drawn by Lord Hale "any further than perhaps by his leaving some loose notes, which were afterwards unskillfully digested." Roberts, Statute of Frauds (1807), preface p. XVII. Lord Chief Justice Wilmot (3 Burr. 1921) said: "Had the Statute of Frauds always been carried into effect, according to the letter, it would have done ten times more mischief than it has done good, by protecting rather than preventing frauds."

Prof. Thayer, in his "Preliminary Treatise on Evidence," p. 429-431, discusses the statute of frauds, and says it is "a very extraordinary enactment to have been passed by an English-speaking community in any age, so comprehensive is it and so far reaching * * *." 14 Ill. Law Review, p. 7.

In 15 Canadian Bar Review, beginning at page 585, we find the Sixth Interim Report of the English Law Revision Committee to the Right Hon. The Viscount Hailsham, Lord High Chancellor of Great Britain, published in the English Weekly Notes for August 14 and 21, 1937. This committee was appointed to consider how far certain legal maxims and doctrines require revision in modern conditions. The committee was required to report specially as to

whether certain enactments should be amended or repealed, and the first one is "Statute of Frauds, 1677, section 4."

In the body of the report, we find this statement: "Contemporary opinion is almost unanimous in condemning the Statute and favoring its amendment or repeal."

At the end of this long discussion of the English Statute of Frauds, we find the "Summary of Recommendations," beginning on page 615, signed by the 14 majority members of the committee, and it begins with these words:

"50. It may be convenient to summarize our recommendations which are as follows:—

"(1) That the following enactments shall be repealed:—
    (a) So much as remains of Section 4 of the Statute of Frauds; * * *."

Then the minority recommendation also agrees that section 4 of the Statute of Frauds should be repealed.

This report is also published in full in The Weekly Notes, volume for 1937, for August 14, beginning on page 284.

The question arises: If the committee's recommendation is that it be repealed in England as an anachronism, should it be slavishly followed here?

The statute of frauds was passed to prevent frauds, and courts have said many times that it will not be allowed to be used to work a fraud upon an innocent person. See Teske v. Dittberner, 70 Neb. 544, 98 N. W. 57.

The question of what cases fall within the requirement of the statute of frauds that the agreement, or a memorandum thereof, be in writing, and in what cases the statute does not apply because it is an original promise, is most difficult to decide, for it has been shown that the English authorities, as well as those of our country, are in such hopeless conflict that it is impossible to reconcile them.

Many decisions have turned on the single point: Was the promise original or collateral? If the object of the promise is to become a surety, that is, a guarantor of another's debt, then it is a collateral promise, and not valid unless found in the writing required by the statute. On the other hand,

even though the effect of the promise is to pay off the debt of another, yet if the evidence discloses that the prime purpose and object of the agreement are to carry out some design and interest of his own, it is unaffected by the statute, because it is an original promise, made on a good consideration, of benefit or harm, moving between the newly contracting parties.

Now, the first question in the case at bar is whether the promise to pay $25 a month for the support of his three grandsons, made in his home at Mitchell to their mother, is enforceable. The law appears to be that "Whether an oral promise to pay the debt of another is enforceable under the statute of frauds depends on whether such promise is an original or a collateral promise. The statute applies to a promise which is collateral or secondary, and merely superadded to that of another, and only to such a promise; a promise which constitutes an original or primary obligation is not within the statute." 37 C. J. S., Statute of Frauds, § 16, p. 522. The text is sustained by a wealth of citations.

In the early Nebraska case of Fitzgerald v. Morrissey, 14 Neb. 198, 15 N. W. 233, this court said briefly, in effect, that where the leading purpose of the promisor is to gain some advantage, or promote some interest or purpose of his own, and the promise is a direct undertaking of the promisor, then it will be valid even though not in writing, and is not a collateral promise. See, also, Peyson v. Conniff, 32 Neb. 269, 49 N. W. 340; Elson v. Nelson, 132 Neb. 532, 272 N. W. 551.

"To be within the statute, the promise must be collateral, secondary, superadded to that of another. If by the promise the promisor incurs an original or primary obligation of his own, one not merely collateral or superadded or secondary to that of another, it is not within the statute. The question is one of intent, and is to be ascertained from the language used in the light of the situation and circum-

stances in which it was made." Kladivo v. Melberg, 210 Iowa 306, 227 N. W. 833.

In determining whether an oral promise to another is original or collateral, the intention of the parties at the time it was made must be regarded and given effect, and, in determining such intention, the situation of the parties, the object sought to be accomplished, and all circumstances attending the transaction should be taken into account. The purposes for which the contract was made may be proved, and must be kept in view in its construction.

"The real character of the promise does not depend altogether on the form of expression, but largely on the situation of the parties; and the question is always what the parties actually understood by the language—whether they understood it to be a collateral or a direct promise." 25 R. C. L., Statute of Frauds, § 72, p. 489. See Garren v. Youngblood, 207 N. C. 86, 176 S. E. 252, 95 A. L. R. 1132; 49 Am. Jur., Statute of Frauds, § 63, p. 419; Hines & Smith Co. v. Green, 121 Me. 478, 118 A. 296.

In case of ambiguity, the language is construed most strongly against the promisor, being governed by the same rules of construction as other contracts.

In a Michigan case, decided in 1867, Blanchard offered to sell his mare for $60. Gibbs asked if he would sell it to Daily for his note if Gibbs would sign it and see that it was paid. Blanchard agreed, and delivered the mare to Daily, who gave his note for six months. Gibbs afterwards endorsed this note on Sunday, which was void in Michigan. Without Gibbs' oral promise, Blanchard would not have delivered the mare. Could Gibbs be held on his oral promise?

The court, with Judge Thomas M. Cooley concurring, held that "The plain, ordinary meaning of the language used in this clause of the statute would seem sufficiently to indicate that the class of special promises required to be in writing includes only such as are secondary or collateral to, or in aid of the undertaking or liability of some

other party whose obligation, as between the promisor and promisee, is original or primary. If there be no such original or primary undertaking or liability of another party, there is nothing to which the promise in question can be secondary or collateral, and the promise is, therefore, original in its nature, and not within the statute. In other words, the statute applies only to promises which are in the nature of guaranties for some original or primary obligations to be performed by another. This has been settled by a remarkably uniform course of decision since the passage of the statute (29 Car. II, ch. 3, § 4) which does not essentially differ from our own and those of most of the states of the Union. So numerous and so uniform have been the decisions upon this point, that it would savor of affectation to cite them." Gibbs v. Blanchard, 15 Mich. 292. This decision was adopted a year after our Nebraska statute was enacted in 1866.

If there is a benefit to the promisor which he did not before, and would not otherwise, enjoy and in addition the act is done upon his request and credit there ordinarily arises an original undertaking not within the statute. Sadd v. Siegelbaum, 124 Conn. 383, 200 A. 346.

"Where an oral promise to pay for goods sold and delivered to a third party is an original one and not merely a collateral undertaking, it need not be in writing. The determinative test is to whom was credit in fact given." Federal Wine & Liquor Co. v. Jabberwock Country Club, 120 N. J. L. 331, 199 A. 594. See Burke v. Yencsik, 120 Conn. 618, 182 A. 135.

The case of Davis v. Patrick, 141 U. S. 479, 35 L. Ed. 826, 12 S. Ct. 58, originally arose in the district court for Knox County, Nebraska, in 1880, and it finally reached the United States Supreme Court. In the opinion written by Justice Brewer is found an excellent discussion, holding that a verbal promise to be personally responsible to pay for hauling ore for another was not within the statute of frauds as being a promise to pay the debt of another.

In the opinion it is said: "But cases sometimes arise in which, though a third party is the original obligor, the primary debtor, the promisor has a personal, immediate and pecuniary interest in the transaction, and is therefore himself a party to be benefited by the performance of the promisee. In such cases the reason which underlies and which prompted this statutory provision fails, and the courts will give effect to the promise." It is further said that he occupied the position of an original promisor, "and it would be a shadow on justice if the administration of the law relieved him from the burden of his promise on the ground that it also resulted to the benefit of the mining company, his debtor. * * * There is force in this contention, as it implies that some one else was also bound, but the real character of a promise does not depend altogether upon the form of expression, but largely on the situation of the parties; * * *."

It is charged by the executor as a ground for reversal in the case at bar that the alleged agreement to pay Jane Allen $25 a month for the support of the three boys is void because it could not be fully performed within one year.

"So it is the generally accepted rule that to bring a contract within its operation there must be an express and specific agreement not to be performed within the space of a year; if the thing may be performed within the year, it is not within the statute, a restricted construction being given to the statute on account of the negative form of the provision." 25 R. C. L., Statute of Frauds, § 29, p. 454. See, also, § 31, p. 457.

"The words 'cannot be fully performed' must be taken literally. The fact that performance within a year is highly improbable or not expected by the parties does not bring a contract within the Statute." 1 Restatement, Contracts, comment b, § 198, p. 262.

An agreement contingent on the life of a person is not within the statute, because by the death of the person within one year a valid performance may be had within that time.

"This, according to the majority view, is true even where performance is contingent on the death of more than one person." 49 Am. Jur., Statute of Frauds, § 30, p. 392. See Powder River Live Stock Co. v. Lamb, 38 Neb. 339, 56 N. W. 1019; Smith, Law of Fraud, § 347, p. 413; 50 Am. Jur., Support of Persons, § 4, p. 871; Moore v. Fox (N. Y.) 10 Johns, 244, 6 Am. Dec. 338.

It is clear that the statute does not apply in the case at bar, for all three of these grandsons might have suffered death by accident or disease within a year.

Insofar as said payments are a contingent liability on the estate of Chauncey Allen after his death, we are inclined to the opinion that the deceased intended such payment of $25 a month to continue so long as needed for the education and support of his grandsons.

It was shown that the promisor had a personal, immediate, and long-continued interest in these boys. It is not unreasonable to conclude that his obligation to pay a small part of their support was not to cease with his death. There was no express limitation of time within which such payments should cease. See Smith v. North Louisiana Sanatarium, 181 Ark. 986, 26 S. W. 2d 97; Toland v. Stevenson, 59 Ind. 485; Barrett v. Towne, 196 Mass. 487, 82 N. E. 698.

In regard to the consideration for the promise made by Chauncey Allen, this court has held: "Where a promise to pay the debt of a third party is a new and independent contract founded on a new consideration of benefit to the promisor, or injury to the promisee, it is not within the statute of frauds, and need not be in writing." Swayne v. Hill, 59 Neb. 652, 81 N. W. 855. See, also, Clay v. Tyson, 19 Neb. 530, 26 N. W. 240.

This dissent is based upon the approved rule that "The applicability of the statute to an oral promise does not depend upon the question as to whether there is a consideration for the promise which would be sufficient to support it if it were not for the Statute of Frauds. The real question is whether or not the consideration is of a character which

stamps the promise as an original one. * * * If the benefit accruing is direct and personal, then the promise is original within the rule, and the validity thereof is not affected by the Statute of Frauds." Annotation, 8 A. L. R. 1199.